Docket Nos. 99584, 99595 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

TRI-G, INC., *et al.*, Appellees, v. BURKE, BOSSELMAN &
WEAVER *et al.*, Appellants.

*Opinion filed June 22, 2006.*

JUSTICE KARMEIER delivered the judgment of the court,
with opinion.
Chief Justice Thomas and Justices Kilbride and Garman
concurred in the judgment and opinion.
Justice Freeman concurred in part and dissented in part,
with opinion, joined by Justices McMorrow and Fitzgerald.

## OPINION

Tri-G, Inc. (Tri-G), brought a legal malpractice action in the
circuit court of McHenry County against the law firm of Burke,
Bosselman & Weaver (Burke) to recover damages it sustained
as a result of Burke's failure to prosecute a complaint Tri-G had
previously filed against Elgin Federal Bank (Elgin Federal).
Following a trial on the merits, a jury found that Burke had
been negligent in handling Tri-G's case against Elgin Federal

and that but for that negligence, Tri-G would have recovered $1,168,775 in compensatory damages and an equal sum in punitive damages from Elgin Federal. Accordingly, the jury returned a verdict in favor of Tri-G and against Burke for $2,337,550.

After the circuit court entered judgment on the jury's verdict, Burke appealed. Tri-G cross-appealed. The appellate court affirmed the judgment in part, reversed in part, and remanded the cause to the trial court for further proceedings. 353 Ill. App. 3d 197. In so ruling, the appellate court expressly rejected Burke's arguments that the award of punitive to Tri-G was either improper as a matter of law or excessive in light of the evidence adduced at trial. It held that Illinois law permits a legal malpractice plaintiff to receive an award of lost punitive damages from a defendant attorney and concluded that the punitive damages award made in this case was justified by the evidence. 353 Ill. App. 3d at 232.

Burke and Tri-G each filed petitions for leave to appeal. 177 Ill. 2d R. 315(a). We allowed their respective petitions and consolidated the appeals for review. The primary issue before us is whether the appellate erred in upholding the award of lost punitive damages to Tri-G. For the reasons that follow, we hold that it did. The judgment of the appellate court is therefore affirmed in part and reversed in part.

The basic principles governing legal malpractice claims are well established. To prevail on a legal malpractice claim, the plaintiff client must plead and prove that the defendant attorneys owed the client a duty of due care arising from the attorney-client relationship, that the defendants breached that duty, and that as a proximate result, the client suffered injury. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005).

The injury in a legal malpractice action is not a personal injury, nor is it the attorney's negligent act itself. Rather, it is a pecuniary injury to an intangible property interest caused by the lawyer's negligent act or omission. The fact that the attorney may have breached his duty of care is not, in itself, sufficient to sustain the client's cause of action. Even if negligence on the part of the attorney is established, no action will lie against the attorney unless that negligence proximately caused damage to the client. The existence of actual damages

is therefore essential to a viable cause of action for legal malpractice. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d at 306-07.

The theory underlying a cause of action for legal malpractice is that the plaintiff client would have been compensated for an injury caused by a third party, absent negligence on the part of the client's attorney. Where the alleged legal malpractice involves litigation, no actionable claim exists unless the attorney's negligence resulted in the loss of an underlying cause of action. If the underlying action never reached trial because of the attorney's negligence, the plaintiff is required to prove that but for the attorney's negligence, the plaintiff would have been successful in that underlying action. A legal malpractice plaintiff must therefore litigate a "case within a case." See *Cedeno v. Gumbiner*, 347 Ill. App. 3d 169, 174 (2004).

The "case within a case" on which Tri-G's malpractice claim is predicated was Tri-G's cause of action against Elgin Federal. That cause of action arose from certain construction loans Tri-G received from the bank to build residential homes in a development known as Huntington Point. Tri-G's complaint, filed in 1981, alleged breach of contract, common law fraud, and violation of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (Ill. Rev. Stat. 1983, ch. 121½, par. 261 *et seq.* (now 815 ILCS 505/1 *et seq.* (West 2002))).

Trial of the case was postponed for several years, during which time Tri-G was represented by a succession of law firms. Eventually, a May 11, 1987, trial date was set by the court. Approximately three months before the trial was scheduled to begin, Tri-G retained Burke to handle the case. The attorney from Burke assigned to represent Tri-G did not file an appearance, however, until May 4, 1987. When the case was called for trial as scheduled the following week, the attorney answered "not ready."

Because the attorney was not prepared to proceed, the trial court dismissed Tri-G's case with prejudice. Tri-G, still represented by Burke, appealed the dismissal. On November 13, 1987, the appellate court dismissed the appeal *sua sponte*

on the grounds that Tri-G had failed to comply with a previous order of that court.

Tri-G subsequently replaced Burke with new legal counsel, who filed a second complaint against Elgin Federal. The new complaint alleged the existence of oral construction loan contracts between the parties, numerous breaches by Elgin Federal of those contracts, and fraud. On Elgin Federal's motion, the circuit court dismissed the complaint based on *res judicata.* The court also imposed sanctions against Tri-G and its attorneys. The appellate court affirmed. *Tri-G, Inc. v. Elgin Federal Savings & Loan Ass'n*, 182 Ill. App. 3d 357 (1989).

With the failure of its substantive claims against Elgin Federal, Tri-G looked to Burke for recourse. In 1989 it filed a legal malpractice against the law firm. It voluntarily dismissed that action in 1994 and refiled it in 1995. Burke then moved to dismiss the complaint. Although Burke's motion was allowed by the circuit court, the appellate court reversed and remanded. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, No. 2–96–0980 (1997) (unpublished order under Supreme Court Rule 23).

Tri-G's original and amended complaints against Burke each consisted of a single count claiming negligence. In its original complaint, Tri-G alleged that Burke was negligent for (1) failing to file an appearance until May 4, 1987; (2) failing to advise Tri-G's witnesses and discuss their testimony in advance of depositions; (3) failing to attend certain depositions; (4) failing to properly prepare the case for trial; and (5) failing to seek a voluntary nonsuit on the date of trial.

The 1981 complaint against Elgin Federal was attached as an exhibit to the malpractice complaint. The 1981 complaint contained 10 counts, claiming breach of contract, common law fraud, and violations of the Consumer Fraud Act (Ill. Rev. Stat. 1981, ch. 121½, par. 261 *et seq.* (now 815 ILCS 505/1 *et seq.* (West 2002))). It alleged that in 1976, Tri-G was the general contractor for a residential real estate development in McHenry County known as the Huntington Point subdivision. First National Bank of Woodstock (First National) owned Huntington Point as the trustee of a land trust with Tri-G as beneficiary. In 1978, Elgin Federal made construction loans to Tri-G to build residential homes on vacant lots in Huntington Point,

˘4˘

specifically enumerating 13 lots. Tri-G entered into a contract with Chain of Lakes Group (CLG), in which CLG agreed to complete construction on eight of those lots, specifically 7, 24, 25, 30, 32, 35, 36, and 37.

Counts I through VII of Tri-G's complaint asserted claims for breach of contract regarding lots 7, 24, 25, 30, 32, 36, and 37, respectively. Tri-G alleged that Elgin Federal breached its construction loan agreements by making payouts to CLG from the construction loans without the written authorization of Tri-G and allowing CLG to submit new contractor's affidavits that Elgin Federal used as a basis for additional payouts in excess of the amounts stated in the original contractor's affidavits submitted by Tri-G.

Concurrent with the construction loans, Elgin Federal made a land loan to Tri-G for improvements to land surrounding the lots. In count VIII of its complaint, Tri-G alleged that Elgin Federal breached that land loan agreement by withholding payouts owed to Tri-G after it entered into the contract for CLG to complete construction on the eight above-listed lots.

In count IX, Tri-G alleged that Elgin Federal committed common law fraud by: (1) making unauthorized payouts on the construction loans for lots 16, 17, 26, 28, and 31; (2) withholding money from Tri-G at the time of closing on lots 16, 26, 28, 30, and 37; (3) withholding from Tri-G the fact that Elgin Federal had made unauthorized disbursements to CLG; (4) allowing CLG to substitute new contractor's affidavits for the original contractor's affidavits with respect to the construction loans on all 13 lots; and (5) misleading Tri-G into believing that an accounting would be done once all of the lots had been closed upon, at which time Tri-G would receive monies withheld by Elgin Federal. In pleading damages under this count, Tri-G itemized the damages incurred with respect to the construction loans on lots 7, 17, 24, 25, 26, 28, 30, 31, 36, and 37. Tri-G further alleged that it was damaged by unauthorized payouts from the land loan it secured from Elgin Federal in the amount of $30,000. Tri-G claimed a total of $139,159 in compensatory damages and $140,000 in punitive damages. In

count X, Tri-G's allegations under the Consumer Fraud Act essentially mirrored those of the common law fraud count.

Discovery ensued. In January 2002, one month prior to trial, Tri-G was allowed to amend the malpractice complaint to add an allegation that Burke was negligent for failing to review and amend the 1981 complaint against Elgin Federal. Also, the trial court denied Burke's motion *in limine* to exclude punitive damages. The court reasoned that if the jury assessed punitive damages against Elgin Federal in the underlying case, that amount would be compensatory damages to Tri-G in the malpractice action.

During the trial, Irene Geschke testified that in June of 1976, she and her husband, Clarence, purchased a 16.5-acre tract of land, intending to develop it as the Huntington Point subdivision. Irene was working as a real estate broker. Irene and Clarence obtained a loan from First National to purchase the property and placed it in a land trust with First National as trustee and Irene and Clarence as beneficiaries. Irene and Clarence formed Tri-G as general contractor for the development of the property. Clarence was the sole shareholder of Tri-G and Irene was principally responsible for Tri-G's operation. Tri-G divided Huntington Point into 46 lots, 45 of which were for single-family homes.

Irene recounted that in 1977, she approached Dennis Neubert of Elgin Federal regarding financing for Tri-G. Tri-G subsequently obtained a loan from Elgin Federal to pay off the loan from First National. The loan was secured by the then-remaining 38 unsold Huntington Point lots, 37 of which were planned for single-family homes. Irene also spoke with Neubert about financing for the construction of homes on Huntington Point. Neubert told Irene that Elgin Federal would finance the construction.

Tri-G introduced into evidence a one-page document from Elgin Federal entitled "Construction Loan Procedure," which dealt with such matters as Elgin Federal's inspection of construction sites and its payout of loan proceeds to subcontractors and suppliers of materials. Tri-G also introduced into evidence several loan commitment letters from Elgin Federal that set forth specific terms for each construction

loan, *e.g.*, the loan amount and the rate of interest. According to Irene, the documents, which purported to memorialize the loan agreements, actually included only some of the loan terms. Additional terms were agreed to orally.

The oral terms identified by Irene were as follows: (1) payout from loans would be made only upon Tri-G's written request; (2) each loan was separate so that funds advanced on one loan could not be used for construction on a lot that was subject to a different loan; (3) although interest on a particular loan would begin accruing once funds were disbursed, principal and interest payments on that loan would not be due until all the funds on that loan had been paid out; and (4) the purchaser of a completed home would be given a loan with the same interest rate and terms, *i.e.*, 9% interest and no points, as the construction loan Tri-G had obtained for that house. Finally, Irene and Neubert agreed that if a subcontractor or supplier of materials required more funds than were originally stated in Tri-G's affidavit itemizing the costs for constructing the home, Tri-G was required to submit an amended affidavit before the additional funds would be disbursed. According to Irene, the loan agreements contained no provision for when payouts could be terminated by Elgin Federal.

Irene testified that Tri-G's dealings with Elgin Federal initially went smoothly. Although she and Neubert agreed that interest payments on any particular loan would not be due until the proceeds had been entirely paid out, Elgin Federal initially billed her for interest, and she paid the interest as billed. Also, when Tri-G needed a payout from one of its loans, Elgin Federal would issue the payout within three days after Tri-G had submitted a payout authorization.

Tri-G built and sold homes on eight of the Huntington Point lots. In each case, in accord with the construction loan agreements, the buyer of the home received a loan from Elgin Federal with the same interest rate and terms as Tri-G's construction loan.

In late 1977, Neubert left Elgin Federal and Edward Swartz assumed responsibility for the Huntington Point loans. Around this time, Tri-G began having difficulties with Elgin Federal. For example, Elgin Federal's response to payout requests slowed

down in early 1978. According to Irene, the slowdown caused one of Tri-G's suppliers, Hines Lumber, to file a lien in February 1978. Irene complained to Swartz about the slowdown in payouts, and Swartz responded that the delay was due to his having just taken over the construction loans from Neubert. Irene stopped paying interest in March 1978.

During Irene's testimony, the trial court, over Burke's objection, allowed Tri-G to introduce evidence of breach of contract and fraud regarding lots not specified in the 1981 complaint. The purpose of this evidence was to establish the existence of a scheme alleged to exist with respect to the lots that were specified in the 1981 complaint.

Irene testified that on April 17, 1978, Swartz sent Tri-G several letters demanding regular monthly payments of principal and interest under three of the construction loans, even though the proceeds had not been paid out entirely on any of these loans. Irene testified that, without warning from Elgin Federal and without her independent knowledge, payouts stopped altogether on May 26, 1978, during Tri-G's construction of homes on 14 projects: lots 7, 16, 17, 22, 24, 26, 28, 30, 31, 32, 35, 36, 37, and 38. The total amount of the loans on these projects was $795,797. As of May 1978, $548,626 in loan proceeds had been paid out and $247,171 remained unpaid. Irene testified that, contrary to Elgin Federal's position, no interest was due on any of the open loans in May 1978 because the proceeds had not been paid out entirely on any of the loans.

According to Irene, she received another letter from Swartz on June 16, 1978. In that letter, Swartz stated that there was a total of $21,688 in delinquent interest on the open construction loans and the land loan. Swartz demanded that the delinquent interest be paid within 45 days. Swartz also stated that Tri-G would have to complete construction of four of the homes on which Tri-G had open loans before Elgin Federal would open any further loans. Swartz demanded that Tri-G begin advertising its unsold homes at "realistic prices." Swartz also stated that purchasers of Huntington Point houses would receive mortgages at 9.25% and one point. Swartz threatened

that if Tri-G did not comply with the terms of the letter, Elgin Federal would take legal action effective August 1, 1978.

Irene testified that at no time before the June 16, 1978, letter did Elgin Federal suggest that Tri-G's homes were overpriced. She also testified that the letter gave no indication that Elgin Federal had decided to terminate payouts, though in fact payouts had ceased several weeks before, unbeknownst to her. Irene noted that, although Elgin Federal required Tri-G to complete four homes before it could obtain any more loans, Elgin Federal continued to refuse to make payouts, which were necessary for construction. Irene testified that, had Elgin Federal continued the payouts and allowed construction to finish, Tri-G could have paid the allegedly delinquent interest with proceeds from sales of the homes. Irene also noted that the terms of the mortgages offered to potential buyers in the June 16, 1978, letter were less favorable than the terms that she and Neubert had agreed upon.

Irene recounted that on June 20, 1978, Elgin Federal sent her bills for interest relative to the loans on several lots. Irene did not believe that she was obligated to pay any interest because the entire proceeds had not been paid out on any of the loans.

Swartz sent Tri-G another letter on July 3, 1978, demanding payment of delinquent interest prior to Elgin Federal refinancing any of the existing construction loans to secure additional funds for construction. Swartz required Tri-G to cure the delinquency on the land loan interest before Elgin Federal would release its interest in any lots that Tri-G might wish to sell to a third party. Swartz also stated that the terms of the mortgages offered to potential buyers in the letter of June 16, 1978, would be valid only until October 1, 1978, after which current market rates and fees would apply. Swartz threatened legal action if Tri-G took no action to complete the homes and establish an advertising plan to sell the homes "at a realistic price." Swartz further stated that Elgin Federal's "board feels that it is important to complete this project at an early date or we will ask for a deed in lieu of foreclosure or foreclosure proceedings will commence."

Swartz informed Irene that Elgin Federal had found a buyer, CLG, for the 23 lots in Huntington Point that were still vacant. CLG proposed to pay $15,000 for each of the vacant lots. Based on her experience in the real estate market, Irene testified that the fair market value of the lots at that time was $25,000 each. Irene had found another party who wanted to buy the lots at a higher price, but Elgin Federal refused to release its mortgages on the lots unless the delinquencies in interest were paid.

Elgin Federal subsequently presented Irene and Clarence with a contract for the sale to CLG of the 23 vacant lots at the price of $15,000 per lot. The contract provided that $9,300 of the purchase price for each lot would be paid to Elgin Federal for the release of the lot under the land loan agreement. The contract also provided that CLG would act as general contractor on 8 of the 14 lots where construction was partially completed, and Tri-G would finish construction on the remaining six partially completed lots. Tri-G would remain responsible for the loans on all 14 lots. To compensate for any shortfall should CLG fail to complete construction of the homes within 90 days of the signing of the contract, CLG was required to place $2,500 in escrow for each of the eight lots on which CLG agreed to complete construction (totaling $20,000). The contract also required Tri-G to pay Elgin Federal $51,300 to cover any deficiency in the open construction loans. The contract further provided that Irene and Clarence would execute the necessary documents to allow CLG to handle exclusively all payouts under construction loans on the partially completed lots to be completed by CLG.

Irene's attorney, Michael Poper, suggested changes to the contract, but Elgin Federal rejected them and essentially gave Tri-G the choice of signing the contract or facing foreclosure on the open loans. Irene and Clarence agreed to the terms. The contract was executed on August 17, 1978. The parties to the contract were First National, as trustee of the land trust; Irene and Clarence, as sole owners of the entire beneficial interest in the land trust; and CLG.

After the contract with CLG was signed, Elgin Federal refused to make payouts on the six lots on which Tri-G was to

˘10˘

complete construction. Irene also discovered that Elgin Federal was permitting CLG to use payouts for purposes other than construction on the eight lots on which CLG was general contractor. Irene considered this practice to be a violation of the oral construction loan agreements, which did not allow payouts from a particular loan to be applied to a purpose other than construction on the lot for which that particular loan was obtained.

Irene reviewed Elgin Federal's ledger and determined the amount of funds that CLG used improperly. The total was $75,787. Irene complained to Swartz about Elgin Federal's refusal to make payouts on the lots on which Tri-G was to complete construction and about the inappropriate payouts to CLG. Swartz told her that the contract between CLG and the Geschkes made CLG the agent of First National and deprived Tri-G of any control over the Huntington Point development.

According to Irene, Elgin Federal made payouts from the land loan without Tri-G's authorization, a practice contrary to the land loan's terms. The trial court admitted into evidence portions of Elgin Federal's ledger reflecting payouts to subcontractors during the years 1977 through 1979. Irene identified $21,725 in payouts that she did not authorize.

Without Tri-G's approval, CLG submitted its own contractor's affidavits on the eight lots on which it had agreed to finish construction. Irene considered this a violation of the terms of the construction loan agreements on those lots. The costs specified in CLG's affidavits exceeded the costs specified in Tri-G's original affidavits, thus reducing Tri-G's equity in the eight homes.

Also, according to Irene's testimony, Elgin Federal eventually foreclosed on the 14 open construction loans. Although CLG did not fulfill its contractual promise to complete construction on the eight lots, Elgin Federal returned the $20,000 in escrow funds to CLG without Irene's knowledge or approval.

Irene testified that she would never have entered into loan agreements with Elgin Federal had she known it did not intend to honor its oral agreements. She also would not have entered into the contract with CLG had Elgin Federal not threatened

foreclosure and disallowed her from selling the lots to any party other than CLG.

Michael Poper was the Geschkes' attorney during their dealings with Elgin Federal. He testified that, without notice, Elgin Federal stopped making payouts on May 26, 1978. Poper noted that, even in June 1978, Elgin Federal still had not formally announced that it had stopped payouts. When Irene complained about the cessation of payouts, Elgin Federal told her that it would make no more payouts until interest was brought current.

In Poper's opinion, Elgin Federal's demand for interest was premature under the construction loan agreements. In his view, if Elgin Federal had continued making payouts, thereby enabling Tri-G to finish constructing the homes, Tri-G could have used the proceeds from the sales of the homes to pay whatever interest was then due. By withholding payouts and thus halting construction, however, Elgin Federal effectively precluded payment of the interest it demanded. Over Burke's objection, Poper testified that he had represented other developers whom Elgin Federal had placed in the same kind of predicament.

John Brittain was a member of Elgin Federal's board of directors when Elgin Federal extended the land and construction loans to Tri-G in 1977. He testified that Elgin Federal's standard policy at that time was to require monthly interest payments on construction loans. Elgin Federal threatened foreclosure in June 1978 because Tri-G had fallen behind in interest payments. Brittain acknowledged that Irene had complained to him that Elgin Federal had paid proceeds from certain of Tri-G's construction loans toward deficiencies on other construction loans. According to Brittain, Elgin Federal commingled funds in this fashion to avoid placing Tri-G in default. Brittain admitted, however, that such commingling was contrary to Elgin Federal's policies. Tri-G rested its case.

For its defense, Burke first called Brent Sherman, the founder and sole shareholder of CLG. Sherman testified to the events surrounding CLG's contract with the Geschkes under which CLG agreed to purchase 23 vacant lots and to finish construction on several of the remaining lots. According to

Sherman, the contract gave him full authority to request payouts from Elgin Federal on the homes he was completing, but he nonetheless obtained Irene's approval for all payouts he requested. Also, because he did not complete construction of the homes within the agreed time, Sherman disbursed to Tri-G $10,000 of the $20,000 CLG had placed in escrow to guarantee completion of the homes. Sherman admitted, however, that he had no documentation reflecting that payment. Sherman denied that he ever conspired with Elgin Federal to deprive Tri-G of control over the Huntington Point development. Also, Sherman had anticipated receiving a profit of $20,000 on each of the 23 lots once construction was complete.

Burke next called Edward Swartz, who testified that he assumed responsibility for Tri-G's loans after Dennis Neubert left Elgin Federal in late 1977. According to Swartz, Elgin Federal's policies made borrowers responsible for monthly interest payments on their construction loans once funds were disbursed. Tri-G initially paid interest on the construction loans without protest but stopped paying in early 1978, giving rise to Elgin Federal's delinquency notices and threats of foreclosure. Contrary to Irene's interpretation, Swartz stated that the contract between CLG and Tri-G made CLG responsible for interest and principal on the loans relating to the construction it had agreed to finish. Swartz denied that funds from Tri-G's loans were ever commingled with funds from the loans CLG took over.

On cross-examination, Swartz conceded that the written construction loan agreements between Elgin Federal and Tri-G did not specify when interest was to be paid. Swartz admitted that Elgin Federal's procedures were "informal" and that not all policies were in writing. Swartz acknowledged that the total amount of delinquent interest reflected in his June 16, 1978, letter included interest for June 1978, which in fact was not due until after the date of the letter. According to Swartz, the characterization of the June interest as delinquent was an innocent error. Swartz categorically denied that Elgin Federal had ever stopped payouts on any of Tri-G's loans. Shown documents from Elgin Federal reflecting that the bank had

made virtually no payouts between May 26 and September 19, 1978, Swartz speculated that no payouts were made because Tri-G had not requested them.

Swartz further admitted on cross-examination that, after the contract between CLG and Tri-G was signed, Irene told him several times that she did not want CLG authorizing payouts on the homes CLG agreed to finish and that she was revoking CLG's authority under the contract to make such authorizations. In response, Swartz told Irene that she would have to cancel the contract in writing if she wanted to stop CLG from authorizing payouts.

Swartz further admitted on cross-examination that he could point to no document memorializing CLG's assumption of responsibility for interest and principal on the loans relating to the construction projects CLG agreed to complete. Swartz acknowledged that the fact that foreclosure proceedings were brought against Tri-G when these projects failed indicated that Tri-G remained responsible for the loans despite the contract with CLG. Swartz also admitted that Elgin Federal commingled funds on Tri-G's loans and that Irene protested the practice on numerous occasions.

At the conclusion of the evidence, the trial court instructed the jury on five specific categories of damages, with their respective elements, sought by Tri-G. In its closing argument, Tri-G sought damages in the following amounts: $75,787 for breach of the construction loan agreements; $21,675 for breach of the land loan agreement; $10,000 for breach of the escrow agreement; $361,000 for fraud that resulted in loss of profits on the 23 vacant lots; and $280,000 for fraud that resulted in lost profits on the 14 partially completed lots. These sums totaled $748,562.

The jury ultimately returned a verdict in favor of Tri-G for $2,337,550, more than three times the amount Tri-G asked for. In four special interrogatories, the jury found that: (1) Burke was negligent in representing Tri-G in the underlying case; (2) Burke's negligence proximately caused Tri-G to lose the underlying case; (3) had Tri-G prevailed in the underlying case, it would have recovered a verdict against Elgin Federal for $1,168,775 in compensatory damages; and (4) had Tri-G

˘14˘

prevailed in the underlying case, Elgin Federal would have been required to pay it an additional $1,168,775 in punitive damages.

Burke filed a posttrial motion seeking alternative forms of relief. Tri-G filed a posttrial motion in which it requested interest on the judgment and an award of attorney fees and costs pursuant to the Consumer Fraud Act. Both motions were denied.

Burke appealed and Tri-G cross-appealed. The appellate court rejected a contention by Burke that the amount of compensatory damages awarded to Tri-G was not supported by the record. 353 Ill. App. 3d at 222-23. It upheld the award of punitive damages to Tri-G (353 Ill. App. 3d at 226-32), but rejected Tri-G's claim for judgment interest (353 Ill. App. 3d at 223-24). In addition, it reversed the trial court's denial of Tri-G's request for attorney fees and costs pursuant to the Consumer Fraud Act and remanded the cause to the trial court to allow Tri-G to request attorney fees and costs incurred in bringing the consumer fraud claim. 353 Ill. App. 3d at 224-26.

One justice dissented solely on the issue of lost punitive damages. 353 Ill. App. 3d at 233 (Gilleran Johnson, J., concurring in part and dissenting in part). That justice would have followed precedent from New York and California and held that "a plaintiff may not recover punitive damages lost by reason of attorney malpractice." 353 Ill. App. 3d at 236 (Gilleran Johnson, J., concurring in part and dissenting in part).

Burke and Tri-G each filed petitions for leave to appeal. 177 Ill. 2d R. 315(a). We allowed their respective petitions and consolidated the appeals for review. We subsequently granted leave to the Illinois Association of Defense Trial Counsel, and the Illinois Civil Justice League, the Du Page County Bar Association, and the Northwest Suburban Bar Association to file *amicus curiae* briefs in support of Burke. See 155 Ill. 2d R. 345.

In its appeal to our court, Burke contends that it was denied procedural due process when Tri-G was permitted to amend its complaint to add allegations regarding lots not specified in the 1981 complaint, that the amount of compensatory damages awarded was not supported by the

record, and that the award of lost punitive damages was erroneous. Because only the punitive damages issue was raised in Burke's petition for leave to appeal (No. 99584). Tri-G filed motions to strike Burke's additional two issues from its brief. We took the motions with the case and now deny them.

Supreme Court Rule 315(b)(3) requires that a petition for leave to appeal contain "a statement of the points relied upon for reversal of the judgment of the Appellate Court." 177 Ill. 2d R. 315(b)(3). A party's failure to raise an issue in the petition for leave to appeal may be deemed a waiver of that issue. *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 152 (2004); *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 124-25 (2004). In this case, however, Tri-G filed its own, separate petition for leave to appeal to contest the lower courts' denial of its claim for judgment interest (No. 99595) and that petition was allowed. Pursuant to Supreme Court Rule 318(a) (155 Ill. 2d R. 318(a)), Burke, as appellee in that cause, is entitled to "seek and obtain any relief warranted by the record on appeal without having filed a separate petition for leave to appeal or notice of cross-appeal or separate appeal." This authorization encompasses the two additional issues asserted by Burke.

In challenging this conclusion, Tri-G argues that to apply Rule 318(a) to permit Burke to assert the additional issues "eviscerates the principle that points relied on by an appellant for reversal not contained in the petition for leave to appeal are waived." We disagree. Tri-G chose to file a separate petition for leave to appeal, and our application of Rule 318(a) is a natural consequence of Tri-G's tactical decision. See, *e.g.*, *Weatherman v. Gary-Wheaton Bank of Fox Valley*, 186 Ill. 2d 472, 489-91 (1999); *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 40-41 (1998). Tri-G's motions to strike the additional issues from Burke's brief are therefore denied.

Turning then to the merits of this appeal, Burke first contends that it was denied procedural due process by the trial court's decision to allow Tri-G to recover damages for the 23 vacant lots and the 14 partially completed lots not specified in the 1981 complaint and by the appellate court's review of that decision. As earlier noted, Tri-G was allowed to amend the

malpractice complaint prior to trial to add an allegation that Burke was negligent for failing to review and amend the 1981 complaint against Elgin Federal. In allowing Tri-G's motion to amend, the trial court stated:

> "Both sides are dragging in the question of damages. *** [T]he proposed amendment has absolutely nothing to do with damages because you can't back door the damages. I mean the damages if there are any, if it gets that far, would have to come from the 1981 complaint. It doesn't come from anywhere else."

The trial court reasoned that the amendment only went to the question of what negligence Tri-G intended to prove.

During Irene's testimony, the trial court allowed Tri-G to introduce evidence of breach of contract and fraud regarding the 23 vacant and 14 partially completed lots not specified in the 1981 complaint. The trial court admitted this evidence for the purpose of establishing an alleged scheme with respect to the lots that were specified in the 1981 complaint. Indeed, the trial court expressly stated that Tri-G would not be able to argue to the jury that it was entitled to damages based on the additional lots. However, at the jury instruction conference, over Burke's objection, the trial court ruled that damages on the fraud claims properly included the additional lots. Tri-G sought such damages, which the jury awarded. In denying Burke's posttrial motion, the trial court explained that the fraud claims relating to the additional lots were encompassed within the 1981 complaint.

In the appellate court, Burke assigned error to this decision. The appellate court disagreed with the trial court that the 1981 complaint was sufficiently broad to encompass claims relating to the additional lots. Noting that it can affirm the trial court's decision on any basis in the record, however, the appellate court held as follows:

> "We hold that the claims outside the 1981 complaint were admissible at the malpractice trial on the basis that a reasonably competent attorney would have filed a motion to amend the complaint to add the claims within a reasonable time after being retained by Tri-G in January 1987, and that such a motion should have

been granted because it would have been proper under the prevailing rules of pleading." 353 Ill. App. 3d at 214.

The appellate court opined that a reasonably competent attorney retained by Tri-G in late January 1987, aware that May 11, 1987, was the date certain for trial, would have immediately reviewed the 1981 complaint. Further, according to the appellate court, given the interrelationship between the claims relating to the lots specified in the 1981 complaint and the same claims relating to the additional lots, a reasonably competent attorney would have sought to amend the 1981 complaint prior to the May 11, 1987, trial. 353 Ill. App. 3d at 214-15.

In this court, Burke specifically contends that the lower courts' decisions cumulatively effected a deprivation of procedural due process because Burke was unable to present a defense to claims related to the additional lots. Burke argues that it was fundamentally unfair for the trial court to permit the jury to award damages on claims relating to the additional lots, which the trial court ruled, during trial, could not be the basis of recovery. Burke further argues that the appellate court, instead of correcting the trial court's error, compounded it by upholding the trial court's decision based on alternative reasoning. Thus, according to Burke, the appellate court's conclusion "was an integral part of the due process violation."

Procedural due process claims concern the constitutionality of the specific procedures employed to deny a person's life, liberty, or property interest. *East St. Louis Federation of Teachers, Local 1220 v. East St. Louis School District No. 189 Financial Oversight Panel*, 178 Ill. 2d 399, 415 (1997). The requirement of due process is met by having an orderly proceeding wherein a person is served with notice, actual or constructive, and has an opportunity to be heard and to enforce and protect his rights. The " 'fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *People ex rel. Devine v. $30,700.00 United States*

˘18˘

*Currency*, 199 Ill. 2d 142, 156 (2002), quoting *Stratton v. Wenona Community Unit District No. 1*, 133 Ill. 2d 413, 432 (1990). Due process does not guarantee against erroneous or unjust decisions by courts which have jurisdiction of the parties and the subject matter, and a constitutional question is not presented where a court may have misconstrued the law or committed an error for which its judgment should be reversed. See *Reyes v. Court of Claims*, 299 Ill. App. 3d 1097, 1104-05 (1998).

Applying these principles to this case, it is clear that Burke was not denied procedural due process. There is no merit to Burke's contention that Burke was not able to present a defense to claims relating to the additional lots. The issue of damages related to the additional lots permeated the entire trial, including Tri-G's pretrial motion to amend the malpractice complaint to include an allegation that Burke was negligent for failing to review and amend the 1981 complaint. "An element of damage anticipated by a pretrial motion can hardly be said to come as a surprise." *Union Electric Power Co. v. Sauget*, 1 Ill. 2d 125, 132 (1953). Further, the evidence of the additional lots is nearly identical to allegations relating to the lots pled in the 1981 complaint. If Burke were truly surprised by evidence of the additional lots, it would have requested a continuance to conduct further discovery. Instead, Burke chose to proceed. Indeed, Burke did not even introduce expert witnesses or other evidence valuating the lots that *were* specified in the 1981 complaint. Burke does not explain how it was prevented from deposing any witness, pursuing any line of questioning, or presenting any avenue of proof. The absence of surprise or other prejudice militates against finding a procedural due process violation. See, *e.g.*, *McDermott v. Metropolitan Sanitary District*, 240 Ill. App. 3d 1, 38-39 (1992); *La Salle National Bank v. International Ltd.*, 129 Ill. App. 2d 381, 397-98 (1970).

In support of its position, Burke cites *Delarosa v. Approved Auto Sales, Inc.*, 332 Ill. App. 3d 623 (2002), *Hiscott v. Peters*, 324 Ill. App. 3d 114 (2001), *Koplin v. Hinsdale Hospital*, 207 Ill. App. 3d 219 (1990), and *Pettigrew v. National Accounts System, Inc.*, 67 Ill. App. 2d 344 (1966). In each of those

cases, new causes of action were adjudicated on the merits without the appellant being given the opportunity to answer the new causes of action, take discovery, and prosecute or defend itself against the new causes of action at trial. Those cases are distinguishable from the matter before us. Unlike the appellants in those cases, Burke was not required to litigate new causes of action on short notice with no opportunity to answer the causes of action, take discovery, and present evidence in opposition to the new causes of action. Burke had ample time to take discovery on all claims related to Tri-G's dealings with Elgin Federal.

Absent its unsuccessful claim of prejudice, Burke's contention amounts to nothing more than an argument that it was denied procedural due process because the decisions of the trial and appellate courts were erroneous. As we have previously indicated, however, procedural due process is not a guaranty against erroneous or unjust decisions, or the incorrect interpretation of statutes or rules of law. Neither an abuse of discretion nor an erroneous rule of law will support a reversal for a deprivation of procedural due process. *Peoples Gas Light & Coke Co. v. Buckles*, 24 Ill. 2d 520, 530 (1962); *Benton v. Marr*, 364 Ill. 628, 629 (1936), quoting *Genslinger v. New Illinois Athletic Club of Chicago*, 332 Ill. 316, 319 (1928). In this case, the trial court had within its discretion the power to rule as it did on the complained-of matters. Even if the challenged rulings of the lower courts may have been erroneous–which we expressly do not decide–they did not deprive Burke of due process of law. See *Kazubowski v. Kazubowski*, 45 Ill. 2d 405, 413 (1970); *Chicago Land Clearance Comm'n v. Darrow*, 12 Ill. 2d 365, 369-70 (1957).

Burke next challenges the amount of the jury's compensatory damages award. As earlier noted, the trial court instructed the jury on the elements of five specific categories of damages that Tri-G sought. In its closing argument, Tri-G requested $75,787 for breach of the construction loan agreements, $21,675 for breach of the land loan agreement, $10,000 for breach of the escrow agreement, $361,000 for fraud that resulted in loss of profits on the 23 vacant lots, and $280,000 for fraud that resulted in lost profits on the 14 partially

completed lots. These amounts totaled $748,562. The jury, however, determined that Tri-G was actually entitled to $1,168,775 in compensatory damages.

In assailing the jury's verdict, Burke contends that Tri-G should not have recovered compensation for lost profits on the 14 partially completed lots. The firm also takes issue with the total amount of the compensatory damages awarded by the jury. Our consideration of these arguments is guided by the principle that "[t]he determination of damages is a question reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court." *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997). Absent a clear indication in the record that the jury failed to follow some rule of law or considered some erroneous evidence, or that the verdict was the obvious result of passion or prejudice, a reviewing court will not upset the jury's assessment of damages. See *Perry v. Storzbach*, 206 Ill. App. 3d 1065, 1069 (1990).

Burke challenges the jury's award of $280,000 for lost profits on the 14 partially completed lots on the grounds that it was speculative and not supported by the evidence. This argument cannot be sustained. As we noted earlier, CLG president Brent Sherman testified that he reasonably anticipated a profit of $20,000 per lot for each completed house. During closing argument, Tri-G relied on Sherman's testimony in requesting compensatory damages for lost profits in the amount of $20,000 for each of the 14 partially completed lots, which totals $280,000. The appellate court held that Sherman's testimony as to the expected profits was an adequate basis for the jury's award. 353 Ill. App. 3d at 221-22.

The controlling principles are well established. "A recovery may be had for prospective profits when there are any criteria by which the probable profits can be estimated with reasonable certainty." *Barnett v. Caldwell Furniture Co.*, 277 Ill. 286, 289 (1917). "In order to recover lost profits, it is not necessary that the amount of loss be proven with absolute certainty. [Citation.] Being merely prospective, such profits will, to some extent, be uncertain and incapable of calculation with mathematical precision." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*,

118 Ill. 2d 306, 315-16 (1987); accord *Barnett*, 277 Ill. at 289. The impossibility of proof of the exact amount of lost profits will not justify refusing damages. The law requires only that the plaintiff approximate the claimed lost profits by competent evidence. Such evidence must with a fair degree of probability tend to establish a basis for the assessment of damages for lost profits. *Barnett*, 277 Ill. at 289. "However, recovery of lost profits cannot be based upon conjecture or sheer speculation. [Citation.] It is necessary that the evidence afford a reasonable basis for the computation of damages ***." *Midland Hotel*, 118 Ill. 2d at 316.

A plaintiff may satisfy the requirement of proving with a reasonable basis or with reasonable certainty damages for claimed lost profits through evidence of past profits in an established business. Generally speaking, however, courts consider evidence of lost profits in a new business too speculative to sustain the burden of proof. *Chapman v. Kirby*, 49 Ill. 211, 219 (1868); see *Malatesta v. Leichter*, 186 Ill. App. 3d 602, 621 (1989); *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 143 Ill. App. 3d 168, 174 (1986).

Reviewing the record, the appellate court observed that Sherman spent several years in the construction business, which he described as profitable, prior to becoming involved in Huntington Point. Each of the 23 vacant lots was comparable to the 14 partially completed lots. Also, Sherman's, *i.e.*, CLG's, business of selling houses for profit was comparable to Tri-G's business of selling houses for profit. In the appellate court's view, Sherman's testimony was an adequate basis for calculating Tri-G's lost profits on the 14 partially completed lots. 353 Ill. App. 3d at 221-22.

Assigning error to the appellate court's reasoning, Burke contends that, as a matter of law, evidence of past success in a similar enterprise is not sufficient to support an award of lost profits and, specifically, past success on one real estate project is not sufficient to support an award of lost profits on a subsequent real estate project. According to Burke, "Sherman's testimony about *his* expectations based on his prior successes on *other* real estate projects was [therefore]

not sufficient to support an award of lost profits of *Tri-G* on *this* project." (Emphases in original.)

We cannot accept Burke's contention. There is no inviolate rule that a new business can *never* prove lost profits. Rather, in some cases, "courts have found that the rule that a new business' profits are too speculative did not fit the circumstances before them." *Milex Products, Inc. v. Alra Laboratories, Inc.*, 237 Ill. App. 3d 177, 192 (1992); see, *e.g.*, *Malatesta*, 186 Ill. App. 3d at 620-22.

The cases on which Burke relies determined that where lost profits are based solely upon speculation, such proof was inadequate to establish lost profits with reasonable certainty. In this case, CLG's business was an established business. The 14 houses to be completed cost the same amount to construct and had comparable prices as the completed houses. Given these facts, with Sherman's testimony, Tri-G's lost profits could be determined with reasonable certainty from CLG's past experience. See, *e.g.*, *Milex*, 237 Ill. App. 3d at 193. We therefore uphold the jury's award of $280,000 for lost profits on the 14 partially completed lots.

Burke's contention that the jury's overall award was excessive presents a more difficult question. Tri-G requested a total of $748,562 in compensatory damages for five categories of damages on which the jury was instructed. The jury, however, awarded $1,168,775 in compensatory damages, which was $420,213–over 50%–more than what Tri-G requested. Burke contends that such an award was not supported by the record and was the result of passion, prejudice, or confusion. It therefore requests that we remand the cause for a new trial solely on the issue of damages or, alternatively, that we order a remittitur in the amount of $420,213, thereby reducing the compensatory damages award to $748,562. We conclude that remittitur is necessary in this case.

Under Illinois law, an award of damages will be deemed excessive if it falls outside the range of fair and reasonable compensation, results from passion or prejudice, or is so large that it shocks the judicial conscience. *Richardson*, 175 Ill. 2d at 113. In Burke's view, the jury's decision to award Tri-G

$420,213 more than it had requested, "could only have been produced by passion, prejudice, or confusion." We disagree. "A jury's award of a verdict higher than that requested by counsel does not, by itself, indicate that the jury acted out of passion or prejudice." See *Fedt v. Oak Lawn Lodge, Inc.*, 132 Ill. App. 3d 1061, 1072 (1985). Having said that, however, we must nevertheless conclude that the jury's verdict, as rendered, cannot stand.

In attempting to rationalize the jury's compensatory damage award, Tri-G suggests that its trial counsel deliberately asked for less than it was entitled to recovery as a strategic maneuver. The record, however, belies that notion. During its closing argument, Tri-G referred extensively to evidence from documents and witnesses. In each of the five categories of damages on which the jury was instructed, Tri-G asked the jury to award it the dollar amount that corresponded to the loss reflected in the evidence. Indeed, in one category of damages, Tri-G presented the jury with a time range within which to determine damages and asked for the *maximum* amount within that range, which the jury awarded.

In its brief, Tri-G additionally responds that the record contains "ample" evidence to support the jury's $1,168,775 compensatory damages award. Citing again to documents and witness testimony, Tri-G argues that the award "appears to consist" of a list of categories of damages, assigning a dollar value to each category. Two of Tri-G's claimed categories of damages, however, are outside of the five categories of damages on which the jury was instructed: "$255,336.00 paid by Tri-G to purchase the land and develop it into 24 lots," and "$240,754.00 loss of money paid by Tri-G in opening waivers for 14 houses."

Tri-G does not dispute that these two claimed categories of damages were not identified in the jury instructions. Rather, Tri-G contends that it is not reversible error for a jury to disregard the elements of damages identified in jury instructions as long as the ultimate damages award "is consistent with the evidence and proven damages." This contention is meritless.

˘24˘

Jurors do not possess a roving commission to find such damages as they please. The damages awarded by a jury must be measured by a legal standard, and that standard must guide the jury's determination as to what sum would compensate the injured party. Accordingly, while the amount of recoverable damages is a question of fact for the jury, the measure of damages upon which the jury's factual computation is based is a question of law for the court (see *United States for the Use of N. Maltese & Sons, Inc. v. Juno Construction Corp.*, 759 F.2d 253, 255 (2d Cir. 1985); *Basic American, Inc. v. Shatila*, 133 Idaho 726, 745, 992 P.2d 175, 194 (1999); 25A C.J.S. *Damages* §342 (2002); 15 Ill. L. & Prac. *Damages* §125, at 558 (2000)), and the court's instructions should limit the jury's consideration to facts that are properly a part of the damages allowable (*Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. Ct. App. 1999); accord *Creek v. Village of Westhaven*, 144 F.3d 441, 447 (7th Cir. 1998) ("A jury's discretion in awarding damages is limited by the parameters of what the law will allow [citations], and it is the court's instructions which hopefully assist the jury"); C. McCormick, Damages §15, at 58 (1935) (observing that, in action for damages, trial judge has duty to include in jury instructions a rule or standard for measuring amount of award)).

In the present case, the trial court instructed the jury: "It is your duty to resolve this case by determining the facts and following the law given in the instructions." See Illinois Pattern Jury Instructions, Civil, No. 1.01(2) (2000). The trial court further instructed the jury on only the five above-stated categories of damages. Under the principles discussed above, Tri-G therefore cannot justify the jury's award of compensatory damages by hypothesizing categories of damages on which the jury was not instructed.

We are thus left with no basis in the law or the record to support a verdict $420,213 greater that Tri-G had requested. Where, as here, a jury's award "exceed[s] the proven damages, it must be corrected. The practice of entering or ordering a remittitur has long been an accepted practice in Illinois and it has been consistently acknowledged to be promotive of both the administration of justice and putting an

end to litigation." See *McElroy v. Patton*, 130 Ill. App. 2d 872, 877 (1970) (collecting authorities); see generally *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 411-13 (1997).

In this legal malpractice action, the underlying case was instituted with the filing of the 1981 complaint–approximately 24 years ago. "Rather than prolong this litigation any further, remittitur will be utilized to correct the excessive verdict." *Peter J. Hartmann Co. v. Capitol Bank & Trust Co.*, 353 Ill. App. 3d 700, 711 (2004).

The applicable principles are widely recognized. A remittitur is an agreement by the plaintiff to relinquish, or remit, to the defendant that portion of the jury's verdict which constitutes excessive damages and to accept the sum which has been judicially determined to be properly recoverable damages. It is a judicial determination of recoverable damages and should not be construed as an agreement between the parties or a concession by the plaintiff that the damages were excessive. See *Carter v. Kirk*, 256 Ill. App. 3d 938, 947-48 (1993); *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 224 Ill. App. 3d 559, 588 (1991), *aff'd*, 159 Ill. 2d 137 (1994); *Haid v. Tingle*, 219 Ill. App. 3d 406, 411 (1991) (collecting authorities).

Although a trial court may refuse to enter judgment on a verdict unless a portion of the verdict is remitted, the court does not have the authority to reduce the damages by entry of a remittitur if the plaintiff objects or does not consent. The trial court must afford the plaintiff the choice of agreeing or refusing to the entry of a remittitur, with the proviso that the plaintiff's refusal to agree to the entry of a remittitur will result in the ordering of a new trial. The only alternative to a remittitur in a case where the verdict exceeds the damages properly proven, or where the verdict can be accounted on the sole basis that the jury acted from some improper motive, such as passion or prejudice, is for the trial judge to order a new trial. *Carter*, 256 Ill. App. 3d at 947-48; *Haid*, 219 Ill. App. 3d at 411-12 (and cases cited therein). Further, Supreme Court Rule 366(a)(5) specifically provides that a reviewing court has the power to grant any relief, including the entry of a remittitur. 155 Ill. 2d R. 366(a)(5).

Accordingly, in the present case, we enter a remittitur of $420,213, thereby reducing Tri-G's compensatory damages award to $748,562, conditioned upon Tri-G's consent. Absent such consent, we order a new trial solely on the issue of damages. See, *e.g.*, *Peter J. Hartmann Co.*, 353 Ill. App. 3d at 711-12; *Haid*, 219 Ill. App. 3d at 417; *Briante v. Link*, 184 Ill. App. 3d 812, 815 (1989).

We next consider Tri-G's contention that the lower courts erred in denying its claim for judgment interest. In considering Tri-G's arguments, which repeat those it presented in the appellate court, we observe that the pertinent facts are undisputed and the issues raised are purely legal. "If the facts are uncontroverted and the issue is the trial court's application of the law to the facts, a court of review may determine the correctness of the ruling independently of the trial court's judgment." *Norskog v. Pfiel*, 197 Ill. 2d 60, 70-71 (2001).

Tri-G divides the interest it seeks into two time periods, with the focal point being June 1, 1987. First, Tri-G seeks "prejudgment" interest, which covers the period from June 1978, when Elgin Federal committed the acts from which the underlying case arose, to June 1, 1987, the approximate date that a verdict would have been entered against Elgin Federal but for Burke's negligence. Prejudgment interest is recoverable only where authorized by agreement of the parties or by statute. In chancery proceedings, however, equitable considerations permit a court to allow interest as the equities of the case may demand. *City of Springfield v. Allphin*, 82 Ill. 2d 571, 576, 579 (1980) (collecting cases); *Continental Casualty Co. v. Commonwealth Edison Co.*, 286 Ill. App. 3d 572, 577 (1997) (collecting cases). Tri-G argues that, had a damages judgment been entered against Elgin Federal in 1987, Tri-G would have been entitled to prejudgment interest on equitable grounds.

Tri-G also seeks "postjudgment" interest for the period from June 1, 1987, through February 28, 2002, when judgment against Burke was entered. Before the appellate court, Tri-G relied on section 2–1303 of the Code of Civil Procedure, which provides in relevant part:

"Judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied ***. When judgment is entered upon any award, report, or verdict, interest shall be computed at the above rate, from the time when made or rendered to the time of entering judgment upon the same, and included in the judgment." 735 ILCS 5/2–1303 (West 2002).

Tri-G argues that, because Burke failed to obtain a judgment against Elgin Federal in 1987, Burke is responsible for "postjudgment" interest, extending from June 1, 1987, when the judgment should have been entered, through February 28, 2002, when Tri-G finally recovered on its allegations against Elgin Federal.

Relying on the plain language of the statute, the appellate court rejected Tri-G's purported category of "postjudgment" interest. "Section 2–1303 speaks of judgments recovered, not judgments that should have been recovered. Tri-G recovered no judgment in this action until February 28, 2002, and therefore this is the date by which interest will be reckoned." 353 Ill. App. 3d at 224.

Before this court, Tri-G concedes that its claim to what it characterizes as "postjudgment" interest "is not based directly" on section 2–1303. Rather, according to Tri-G:

"Combining section [2–1303] and the principle that the judgment in a legal malpractice case is supposed to give the plaintiff 'those sums which would have been recovered if the underlying suit had been successfully prosecuted,' *** Tri-G is entitled to additional compensatory damages equal to the amount of post-judgment interest on a judgment that would have been entered in June 1987 but for Burke's negligence."

Tri-G now contends that the appellate court's rejection of its claim to "postjudgment" interest "completely ignored the principle that the prevailing plaintiff in a legal malpractice case is entitled to everything it would have recovered if the underlying action had been successfully prosecuted."

This argument is erroneous. A judgment is the final determination of a court upon matters submitted to it in an

action or proceeding. A judgment is the judicial act of the court. In contrast, the right to judgment interest, apart from contract, "does not emanate from the controversy, or from the judgment, or from anything of a judicial nature. *** The recovery of interest in this State, not contracted for, finds its only authority in the statute. It is purely statutory." *Blakeslee's Storage Warehouses, Inc. v. City of Chicago*, 369 Ill. 480, 482-83 (1938).

In this case, as the appellate court reasoned, section 2–1303 refers only to judgments *recovered*, not to judgments that should have been recovered. We must give effect to this statutory provision by giving its language its plain and ordinary meaning. *Hall v. Henn*, 208 Ill. 2d 325, 330 (2003). Therefore, we agree with the appellate court that the focus of this claim should not be June 1, 1987, the date of a purported, hypothetical judgment against Elgin Federal, but rather February 28, 2002, the date when the judgment against Burke was entered, which was the only judgment rendered in this legal malpractice action.

Because February 28, 2002, is the operative date, the appellate court reasoned that the interest Tri-G was seeking was actually entirely prejudgment interest, but of two types. In the appellate court's view, the interest covering the period from June 1978 to June 1, 1987, was sought from Burke only derivatively, its ultimate basis being Elgin Federal's wrongdoing. By contrast, the interest for the period from June 1, 1987, to February 28, 2002, was claimed directly on the basis of Burke's own negligent misconduct. 353 Ill. App. 3d at 224.

In analyzing and rejecting Tri-G's claims for this interest, the appellate court looked to the nature of the claims for which interest was sought. With respect to later period, ending February 28, 2002, the appellate court reasoned that the request for interest failed because the claim against Burke was one at law and our state does not allow nonstatutory prejudgment interest on any type of claim at law. We agree.

As we have already suggested, "[i]t is well settled that interest is not recoverable absent a statute or agreement providing for it." *Alphin*, 82 Ill. 2d at 576. An exception to this

rule exists in equity. "In *chancery proceedings*, the allowance of interest lies within the sound discretion of the judge and is allowed where warranted by equitable considerations and disallowed if such an award would not comport with justice and equity." (Emphasis added.) *Alphin*, 82 Ill. 2d at 579; accord *Groome v. Freyn Engineering Co.*, 374 Ill. 113, 131 (1940) (observing: "In a proper case, equitable considerations permit a court of equity to allow or disallow interest as the equities of the case may demand"). The availability of equitable relief is not necessarily precluded merely because a case is heard in the law division of a circuit court, nor is equitable relief automatically awarded merely because a case is proceeding in the chancery division of a circuit court. Rather, it is the substance of the claim that determines the appropriate relief and the nature of the court. *Continental Casualty Co.*, 286 Ill. App. 3d at 579; see, *e.g.*, *In re Estate of Wernick*, 127 Ill. 2d 61, 86-87 (1989) (referring to "proceedings sounding in equity"). There is no question, however, that this legal malpractice action was entirely an action at law. See 65A C.J.S. *Negligence* §649 (2000) (stating that negligence is an action at law); *Cook v. Gould*, 109 Ill. App. 3d 311, 314 (1982) (stating that legal malpractice action is no different than cause of action for ordinary nonprofessional negligence). "Illinois courts have declined to apply the rule governing equitable awards of prejudgment interest to cases at law, notwithstanding that an injured party who is eventually compensated may suffer detriment from the inability to use the money from the date of loss to the date of compensation." *Continental Casualty Co.*, 286 Ill. App. 3d at 579 (collecting cases). Prejudgment interest in therefore not available for the period ending February 28, 2002.

In our view, the same rationale is applicable to the earlier period between June 1978 and June 1, 1987. The interest for that period was ultimately linked to the February 28, 2002, judgment and is therefore based on the legal malpractice claim against Burke, just as the interest for the latter period was. Because prejudgment interest is not available in legal malpractice cases, Tri-G's claim for prejudgment interest for this earlier period was also properly rejected.

In reaching this conclusion, we are aware that our analysis on this point differs from that of the appellate court. It is axiomatic, however, that we are not bound by the appellate court's reasoning and may affirm for any basis presented in the record. *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 261 (2004).

The final issue in this case, and the only one about which the members of the appellate court were in disagreement, concerns the jury's decision to include in its judgment against Burke the sum of $1,168,775 to compensate Tri-G for lost punitive damages Tri-G would have received in the underlying action against Elgin Federal but for the Burke's legal malpractice. As noted earlier in this opinion, Burke contended in the appellate court that allowing recovery of punitive damages was expressly prohibited by 2–1115 of the Code of Civil Procedure, which provides that "[i]n all cases, whether in tort, contract or otherwise, in which the plaintiff seeks damages by reason of legal, medical, hospital, or other healing art malpractice, no punitive, exemplary, vindictive or aggravated damages shall be allowed." 735 ILCS 5/2–1115 (West 2002).

The appellate court rejected Burke's position, over the dissent of one justice. It viewed Tri-G's lost punitive damages in the underlying case as an element of compensatory damages in the malpractice action, and held that such compensatory damages were not prohibited by Code of Civil Procedure section 2–1115. 353 Ill. App. 3d at 226-32. In reaching this result, the appellate court acknowledged the divergence of authority on this issue. The court recognized that courts in New York and California have held, based on public policy, that lost punitive damages are not recoverable in a legal malpractice action. 353 Ill. App. 3d at 226-27 (citing *Ferguson v. Lieff, Cabraser, Heimann & Bernstein, LLP*, 30 Cal. 4th 1037, 69 P.3d 965, 135 Cal. Rptr. 2d 46 (2003), and *Summerville v. Lipsig*, 270 A.D.2d 213, 704 N.Y.S.2d 598 (2000)).

The appellate court discussed *Ferguson*, which presented several reasons for prohibiting recovery of lost punitive damages in legal malpractice actions. First, according to *Ferguson*, allowing such recovery would defeat the punitive

and deterrent purposes of punitive damages because the negligent attorney in the legal malpractice action is usually not the tortfeasor who committed the intentional or malicious acts that gave rise to the punitive damages claim in the underlying case. Therefore, imposing liability for lost punitive damages on the negligent attorney would neither punish the culpable tortfeasor nor deter that tortfeasor and others from committing similar wrongful acts in the future. Also, the amount of the award bears no relationship to the gravity of the negligent attorney's misconduct or the attorney's wealth. 353 Ill. App. 3d at 227, discussing *Ferguson*, 30 Cal. 4th at 1046-48, 69 P.3d at 970-71, 135 Cal. Rptr. 2d at 52-54; see *Summerville*, 270 A.D.2d at 213, 704 N.Y.S.2d at 599.

Second, according to *Ferguson*, allowing recovery of lost punitive damages in legal malpractice actions would violate public policy against speculative damages for several reasons. Compensatory damages in a legal malpractice action requires an objective determination. However, an award of punitive damages is an expression of the jury's moral condemnation and thus necessarily requires a moral judgment. Because moral judgments are inherently subjective, a jury assessing damages in a legal malpractice action cannot objectively determine whether punitive damages would have been awarded or the proper amount of those damages with any legal certainty. Also, the standards of proof for compensatory and punitive damages differ. Accordingly, the standard of proof for lost punitive damages would be a standard in a standard. This pragmatic difficulty is so complex that it militates against recovery or such damages. 353 Ill. App. 3d at 227, discussing *Ferguson*, 30 Cal. 4th at 1048-49, 69 P.3d at 971-72, 135 Cal. Rptr. 2d at 54-55.

Lastly, as the *Ferguson* court discussed, allowing malpractice plaintiffs to recover lost punitive damages would exact a societal cost. Exposing attorneys to such liability would likely increase legal malpractice premiums, cause insurers to exclude coverage for these damages, or discourage insurers from providing professional liability insurance in the jurisdiction. This financial burden on attorneys would probably make it more difficult and costly for consumers to obtain legal services,

or to obtain recovery for legal malpractice. 353 Ill. App. 3d at 227, discussing *Ferguson*, 30 Cal. 4th at 1050, 69 P.3d at 972-73, 135 Cal. Rptr. 2d at 55-56. Further, there is no compelling reason to take these risks. The recovery of lost punitive damages is not necessary to make a successful plaintiff whole in a legal malpractice action. Rather, a plaintiff is made whole by compensatory damages and punitive damages constitute an undeserved windfall. 353 Ill. App. 3d at 227, discussing *Ferguson*, 30 Cal. 4th at 1050-51, 69 P.3d at 973, 135 Cal. Rptr. 2d at 56.

The appellate court recognized that the view taken by the courts of California and New York is not universally accepted. Courts in several jurisdictions have held that a plaintiff in a legal malpractice action may recover as compensatory damages those damages that the plaintiff would have been awarded as punitive damages in the underlying action. 353 Ill. App. 3d at 226-27 (citing *Jacobsen v. Oliver*, 201 F. Supp. 2d 93 (D.C. 2002) (interpreting District of Columbia law), *Haberer v. Rice*, 511 N.W.2d 279 (S.D. 1994), *Scognamillo v. Olsen*, 795 P.2d 1357 (Colo. App. 1990), *Elliott v. Videan*, 164 Ariz. 113, 791 P.2d 639 (1989), and *Hunt v. Dresie*, 241 Kan. 647, 740 P.2d 1046 (1987)). Rather than focusing on the purpose behind punitive damages, these courts have focused on the concept of compensatory damages. 353 Ill. App. 3d at 227-28.

Compensatory damages for negligence are those which flow directly and proximately from a defendant's breach of duty owed to a plaintiff. In a legal malpractice action based on an attorney's breach of duty to represent the client in a prior case, it is the defendant attorney's conduct and its consequences which govern the analysis of damages. See *Scognamillo*, 795 P.2d at 1361. "If an attorney's negligence is the cause of dismissal of the underlying claim, the proper measure of damages is all compensatory and punitive damages awarded by the jury in the trial of the case within a case." *Elliott*, 164 Ariz. at 119-20, 791 P.2d at 645-46. From the vantage point of the underlying case, some of a plaintiff's damages might be designated "punitive" damages. However, from the vantage point of the legal malpractice action, all the damages are simply those which proximately resulted from the attorney's

negligence. Indeed, they are no longer properly called punitive damages. *Hunt*, 241 Kan. at 661, 740 P.2d at 1057. Thus, the punitive damages assessed in the underlying case "are part and parcel" of the damages which the plaintiff suffered as a result of the defendant's alleged negligence. See *Haberer*, 511 N.W.2d at 288; *Scognamillo*, 795 P.2d at 1361.

These courts have also reasoned that allowance of lost punitive damages in a legal malpractice action furthers the goal of deterrence: "Attorneys who appreciate that they will be liable in malpractice actions for 'lost punitives' will be motivated to exercise reasonable care in investigating or defending punitive damages claims." *Jacobsen*, 201 F. Supp. 2d at 101-02, citing *Hunt*, 241 Kan. at 661, 740 P.2d at 1057.

After discussing the two conflicting approaches, the appellate court adopted the view of the latter group of jurisdictions and concluded that it should regard lost punitive damages in the underlying case as compensatory damages in the malpractice case. In its view,

> "the proper focus of our analysis [is] what would make the plaintiff whole with respect to the defendant attorney's negligence. When, as in this case, a jury has determined that the plaintiff would have been entitled to punitive damages but for the negligence of the attorney, then such damages must be recoverable in order for the plaintiff to be made whole. We note that this result is consistent with the general principle in this state that '[a] legal malpractice plaintiff is entitled to recover those sums which would have been recovered if the underlying suit had been successfully prosecuted.' *Weisman v. Schiller, Ducanto & Fleck*, 314 Ill. App. 3d 577, 580 (2000). Based on (1) our view of lost punitive damages as compensatory and (2) the fact that such damages are not imposed for the purpose of punishing the attorney who commits malpractice, we hold that section 2–1115 does not bar the recovery of lost punitive damages in a legal malpractice case." 353 Ill. App. 3d at 228-29.

The appellate court lastly concluded that the evidence adduced at trial justified the award of punitive damages. 353 Ill. App. 3d at 232.

The dissenting justice, who rejected the majority's approach, observed that punitive damages are not awarded for compensation and have nothing to do with a plaintiff's loss or making the plaintiff whole. Rather, the purpose of punitive damages is similar to a criminal penalty, *i.e.*, to punish a defendant for wrongdoing and to deter that defendant and others from committing similar misconduct in the future. Also, section 2–1115 of the Code of Civil Procedure (735 ILCS 5/2–1115 (West 2002)) bars recovery of punitive damages in a legal malpractice action. The dissent viewed the appellate court majority as attempting to "circumvent" these limitations by "mischaracterizing" lost punitive damages as compensatory damages. 353 Ill. App. 3d at 233-34 (Gilleran Johnson, J., concurring in part and dissenting in part). The dissent also observed: "It is inconsistent with Illinois public policy to transfer punishment and deterrence intended for a malicious, fraudulent, or deliberately oppressive wrongdoer to another who has not acted with such a wanton disregard." 353 Ill. App. 3d at 234 (Gilleran Johnson, J., concurring in part and dissenting in part). Based on these considerations, the dissenting justice concluded that "a plaintiff may not recover punitive damages lost by reason of attorney malpractice." 353 Ill. App. 3d at 236 (Gilleran Johnson, J., concurring in part and dissenting in part).

Burke assigns error to the reasoning and conclusion of the appellate court majority on this issue, and points to the dissent as "cogent and correct, and ably describ[ing] why the majority was wrong and why this Court should reverse the award of underlying punitive damages." Supported by *amici*, Burke focuses on the nature of punitive damages. It is well established that such damages are not awarded as compensation to a plaintiff. Rather, they serve to punish the defendant and to deter the defendant and others from committing similar misconduct in the future. Misconduct for which punitive damages are imposed must be outrageous, because it is committed with an evil motive or a reckless

indifference to the rights of others. See *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414-16 (1990) (collecting authorities). Indeed, the punitive and deterrent function of punitive damages is similar to that of a criminal penalty. "Because of their penal nature, punitive damages are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded." *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 188 (1978).

Burke correctly observes that it was not a wanton or malicious wrongdoer. Elgin Federal was. Elgin Federal, however, will bear none of the consequences of its wrongdoing. If the punitive damage award is allowed to stand, those consequences will fall entirely on Burke.

Burke argues that punitive damages imposed against a wrongdoer in the underlying case do not become compensatory when paid by the attorney in the legal malpractice action. In Burke's view, shifting the punishment from the wrongdoer in the underlying case to the law firm in the legal malpractice action does not make the punishment less punitive. Rather, Burke continues, it makes the punishment unjust because it is inflicted on the wrong party.

In support of its argument, Burke notes the following comment from the Restatement (Third) of the Law Governing Lawyers:

> "A few decisions allow a plaintiff to recover from a lawyer punitive damages that would have been recovered from the defendant in an underlying action but for the lawyer's misconduct. However, such recovery is not required by the punitive and deterrent purposes of punitive damages. Collecting punitive damages from the lawyer will neither punish nor deter the original tortfeasor and calls for a speculative reconstruction of a hypothetical jury's reaction." Restatement (Third) of the Law Governing Lawyers §53, Comment *h*, at 393 (2000).

According to Burke: "A lost opportunity to punish does not become 'compensatory' and should not be recoverable from someone other than the person for whom the punishment was intended."

Burke further cites section 2–1115 of the Code of Civil Procedure, which bars recovery of punitive damages in a legal malpractice action. 735 ILCS 5/2–1115 (West 2002). Burke reasons that if punitive damages cannot, by statute, be imposed on a law firm in a legal malpractice action for its own negligence, it follows that punitive damages cannot be imposed on the firm for the intentional or reckless wrongdoing of someone else. Burke contends that the appellate court erred "by shifting Elgin Federal's punishment onto Burke."

Burke next contends that the award of lost punitive damages that would have been imposed against Elgin Federal in the underlying case "grants Tri-G a windfall" in this legal malpractice action. Burke notes this court's recognition of the effect of punitive damages imposed against a defendant on the plaintiff's compensation. See *Mattyasovszky v. West Towns Bus Co.*, 61 Ill. 2d 31, 36 (1975) ("The fine that is imposed upon the defendant in a criminal case goes to the State. But in a civil case the exaction taken from the defendant, under the label of exemplary damages, becomes a windfall for the plaintiff"). According to Burke, granting a legal malpractice plaintiff the punitive damages it would have recovered in the underlying case "is not a 'make-whole,' compensatory recovery. It is a windfall."

In further support of its position, Burke urges this court to adopt what it considers to be the "well-reasoned" rationale of the above-mentioned *Ferguson* and *Summerville* decisions. Burke also criticizes the cases that allow recovery of lost punitive damages in the underlying case as compensatory damages in the legal malpractice action. In Burke's view, the case law allowing such recovery is wrongfully decided, or at least factually distinguishable.

Finally, Burke warns that allowing recovery for lost punitive damages in the underlying case as compensatory damages in a legal malpractice action will necessarily result in increased professional liability insurance premiums or denials of coverage. According to Burke, attorneys representing plaintiffs will be encouraged to seek punitive damages in cases where they would not have done so, motivated by a fear that "their

failure to make the claim could be the seed from which a malpractice claim might grow."

Whether a plaintiff in a legal malpractice action may recover as an element of damages punitive damages he or she would have recovered in the underlying action but for the attorney's professional negligence is a question of first impression in Illinois. It is a question on which reasonable minds can certainly disagree. The dissent in the appellate court, the dissent which follows in this case, and the split among courts from other jurisdictions illustrates that sound arguments can be made for both sides of the issue. In the end, however, we have concluded that the approach taken by the courts of California and New York and urged by Burke in this case represents the sounder view. Lost punitive damages are not recoverable in a subsequent action for legal malpractice.

Disallowing lost punitive damages means that plaintiffs in legal malpractice actions may not receive as much money as they might have if the underlying action had been handled properly. Compensating plaintiffs, however, is but one of several factors that must be balanced in assessing whether lost punitive damages should be recognized in legal malpractice actions. There is no reason in logic or the law why it should be given preeminent effect where, as here, the jury has already awarded full compensation to the plaintiff for all the damages it actually sustained.

Punitive, or exemplary, damages are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future. *Loitz v. Remington Arms Co.*, 138 Ill. 2d at 414. Allowing Tri-G to recover its lost punitive damages from Burke would not advance that policy in any way. To the contrary, by holding the firm liable for the intentional or willful and wanton misconduct of a third party, it tears the concept of punitive damages from its doctrinal moorings.

Section 2–1115 of the Code of Civil Procedure (735 ILCS 5/2–1115 (West 2002)) expressly bars recovery of punitive damages in a legal malpractice action. By characterizing lost punitive damages as "compensatory," Tri-G is attempting to

evade reach of this statute. In our view, its efforts are ultimately unpersuasive. If the General Assembly has determined that lawyers cannot be compelled to pay punitive damages based on their own misconduct, as section 2–1115 decrees, it would be completely nonsensical to hold that they can nevertheless be compelled to pay punitive damages attributable to the misconduct of others. Any construction of the law that permits such a result would be absurd and unjust.[1]

For the foregoing reasons, we reverse that portion of the appellate court's judgment which upheld the award of $1,168,775 in lost punitive damages to Tri-G. The judgment in favor of Tri-G and against Burke is hereby reduced by that amount. We also reverse the appellate court's judgment to the extent that it sustained the full $1,168,775 in compensatory damages awarded to the company by the jury. Pursuant to

---

[1]Contrary to the claim made by Justice Freeman in his separate opinion, this characterization is not meant to castigate him or anyone else on the court. It is simply an application of the "no absurdity" rule for statutory construction. The rule has been formulated in various ways, but essentially it holds that statutes should be construed in a manner that avoids absurd, unreasonable, unjust or inconvenient results. See, *e.g.*, *In re Mary Ann P.,* 202 Ill. 2d 393, 406 (2002). Our court invokes the rule frequently. It appeared in *In re Donald A.G.*, No. 100965 (April 19, 2006), an opinion we just filed, and is regularly cited by this court and our appellate court. Justice Freeman, himself, has discussed it in cases he has authored. See, *e.g.*, *Antunes v. Sookhakitch*, 146 Ill. 2d 477, 485-488 (1992).

Supreme Court Rule 366(a)(6) (155 Ill. 2d R. 366(a)(5)), we enter a remittitur of $420,213 on the compensatory damage award and affirm the judgment entered in favor of Tri-G for the reduced amount of $748,562. If Tri-G does not consent to the entry of a remittitur within 21 days of the filing of this opinion, or any further period in which the mandate is stayed, the cause will be remanded to the circuit court of McHenry County for a new trial solely on the issue of damages. In all other respects, the judgment of the appellate court is affirmed.

*Appellate court judgment*
*affirmed in part and reversed in part;*
*circuit court judgment*
*affirmed in part and reversed in part;*
*remittitur entered.*

JUSTICE FREEMAN, concurring in part and dissenting in part:

My colleagues in the majority hold that lost punitive damages are not recoverable in a legal malpractice action. See slip op. at 28-36. The majority offers insufficient justification for allowing legal malpractice plaintiffs to be candidly undercompensated. Further, the majority disregards the fundamental distinction between the nature of the damages that would have been awarded to Tri-G in the underlying case and the nature of the damages that were actually awarded to Tri-G in this legal malpractice action. Accordingly, I dissent specifically from this portion of the court's opinion.

After recognizing that this "is a question on which reasonable minds can certainly disagree," and "that sound arguments can be made for both sides of the issue," this court now holds: "Lost punitive damages are not recoverable in a subsequent action for legal malpractice." Slip op. at 35. The court then frankly concedes: "Disallowing lost punitive damages means that plaintiffs in legal malpractice actions may not receive as much money as they might have if the underlying action had been handled properly." Slip op. at 35. After making this candid admission, my colleagues in the

majority attempt to justify this gross injustice by positing: "Compensating plaintiffs, however, is but one of several factors that must be balanced in assessing whether lost punitive damages should be recognized in legal malpractice actions." Slip op. at 35.

This declaration leads the reader to anticipate a thorough discussion of the reasons why this court is going to allow legal malpractice plaintiffs to be candidly undercompensated. However, the court points to only one reason for its conclusion: the attorney in the legal malpractice action was not the wrongdoer in the underlying case. I cannot accept this reasoning.

A bare majority of this court accepts Burke's emphasis on the nature of punitive damages and relies solely thereon in bluntly denying full compensation to legal malpractice plaintiffs. However, I consider reference to the nature of compensatory damages to be more helpful in resolving this case. An award of compensatory damages is intended to compensate an injured person for the wrong or injury that person sustained. The goal is to make the injured party whole and restore the injured party, as nearly as reasonably possible, to the position in which he or she would have held absent the injury. See *Harris v. Peters*, 274 Ill. App. 3d 206, 207 (1995); *Rodrian v. Seiber*, 194 Ill. App. 3d 504, 508-09 (1990); *Roark v. Musgrave*, 41 Ill. App. 3d 1008, 1011 (1976); 25 C.J.S. *Damages* §21 (2002). In this case, the appellate court reasoned:

> "Of course, a punitive damages award was not imposed against [Burke]. The verdict form designates the $2,337,550 simply as 'damages,' and one of the special interrogatories specifies what amount of that award represents punitive damages that Tri-G would have recovered but for [Burke's] negligence. Thus, the judgment against [Burke] is designed to compensate, not punish." 353 Ill. App. 3d at 229.

I agree. I view the punitive damages that would have been imposed against Elgin Federal in the underlying case as an element of Tri-G's compensatory damages in this legal malpractice action.

It is indisputable that Burke's negligence deprived Tri-G of a punitive damages award and that Tri-G will not receive all sums to which it was entitled in the underlying case unless Burke is directed to pay an amount equal to the underlying punitive damages. "The legal malpractice action places the plaintiff in the same position he or she would have occupied but for the attorney's negligence." *Bloome v. Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, P.C.*, 279 Ill. App. 3d 469, 478 (1996). Thus, a plaintiff's damages in a legal malpractice action are limited to the actual amount the plaintiff would have recovered had he or she been successful in the underlying case. *Eastman*, 188 Ill. 2d at 412; see *Weisman v. Schiller, Ducanto & Fleck*, 314 Ill. App. 3d 577, 580 (2000) ("A legal malpractice plaintiff is entitled to recover those sums which would have been recovered if the underlying suit had been successfully prosecuted." In this case, "[Burke] simply has been called to account for the full consequences of its professional negligence." 353 Ill. App. 3d at 229.

Further, this court relies on section 2–1115 of the Code of Civil Procedure, which bars recovery of punitive damages in a legal malpractice action. 735 ILCS 5/2–1115 (West 2002). My colleagues in the majority explain:

> "By characterizing lost punitive damages as 'compensatory,' Tri-G is attempting to evade reach of this statute. In our view, its efforts are ultimately unpersuasive. If the General Assembly has determined that lawyers cannot be compelled to pay punitive damages based on their own misconduct, as section 2–1115 decrees, it would be completely nonsensical to hold that they can nevertheless be compelled to pay punitive damages attributable to the misconduct of others. Any construction of the law that permits such a result would be absurd and unjust." Slip op. at 36.

My colleagues in the majority misperceive the nature of the damages that the jury awarded in this legal malpractice action.

As revealed by a special interrogatory, the jury in this legal malpractice action awarded Tri-G $1,168,775 in compensatory damages for lost punitive damages that would have been

imposed against Elgin Federal in the underlying case. The jury's assessment of lost punitive damages was not a finding that Burke's conduct was outrageously willful and wanton; it was a finding that Elgin Federal's conduct was. Although Burke's conduct was only negligent, it nevertheless caused Tri-G to lose its entire underlying claim. See *Elliott v. Videan*, 164 Ariz. 113, 119, 791 P.2d 639, 645 (1989). In this case, the appellate court reasoned as follows:

> "[A]s we noted above, a punitive damages award has not been imposed against any party to this dispute. Rather, [Burke] has been made to compensate Tri-G for the recovery, composed in part of punitive damages, that was denied it by [Burke's] negligence. Elgin Federal, the party that should have been punished, was insulated by [Burke's] negligence, and now [Burke] is being held liable for the full consequences of that negligence, in accord with the dictate that a legal malpractice plaintiff is entitled to whatever sums it would have recovered in the underlying action but for the malpractice. [Burke] is not being punished; it is being made to compensate." 353 Ill. App. 3d at 230.

I agree with the appellate court's view of the record.[2]

This court expressly adopts the rationale of the above-discussed *Ferguson* and *Summerville* decisions. Slip op. at 35. However, I view as better reasoned the decisions that allow the recovery of lost punitive damages in the underlying case as an element of compensatory damages in the legal malpractice

---

[2]Parenthetically, the court correctly recognizes that this "is a question on which reasonable minds can certainly disagree," and "that sound arguments can be made for both sides of the issue." Slip op. at 35. It is curious that my colleagues in the majority subsequently castigate this viewpoint of Tri-G, shared by their dissenting colleagues, as "nonsensical" and "absurd and unjust." Slip op. at 36. The use of such rhetoric in this case is unfortunate and uncivil.

action. See *Jacobsen v. Oliver*, 201 F. Supp. 2d 93 (D.C. 2002) (interpreting District of Columbia law); *Haberer v. Rice*, 511 N.W.2d 279 (S.D. 1994); *Scognamillo v. Olsen*, 795 P.2d 1357 (Colo. App. 1990); *Elliott v. Videan*, 164 Ariz. 113, 791 P.2d 639 (1989); *Hunt v. Dresie*, 241 Kan. 647, 740 P.2d 1046 (1987).

These cases are in accord with a fundamental principle of tort law. "The general rule of damages in a tort action is that 'the wrongdoer is liable for all injuries resulting from the wrongful acts \*\*\*, provided the particular damages are the legal and natural consequences of the wrongful act imputed to the defendant, and are such as might reasonably have been anticipated.' " *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 543 (1996), quoting *Siemieniec v. Lutheran General Hospital*, 117 Ill. 2d 230, 259 (1987). I agree with the court in *Jacobsen* that "permitting recovery of punitive damages as compensatory damages in a legal malpractice action is consistent with [this principle]." *Jacobsen*, 201 F. Supp. 2d at 102, citing *Haymon v. Wilkerson*, 535 A.2d 880, 885 (D.C. 1987) ("The normal measure of tort damages is the amount which compensates the plaintiff for all of the damages proximately caused by the defendant's negligence"). I agree with these cases that, from the vantage point of the legal malpractice action, all the damages are simply those which proximately resulted from the attorney's negligence. Accordingly, the punitive damages assessed in the underlying case are included in the damages which the plaintiff suffered as a result of the defendant's negligence. See, *e.g.*, *Jacobsen*, 201 F. Supp. 2d at 100-02; *Haberer*, 511 N.W.2d at 288; *Elliott*, 164 Ariz. at 119-20, 791 P.2d at 645-46. As the dissent in *Ferguson* correctly explained: "In a malpractice action, punitive damages lost because of attorney error are not true punitive damages but are merely *a measure* of some of the injury resulting from the attorney's malpractice. Thus, lost punitive damages are a form of compensatory damages." (Emphasis in original.) *Ferguson*, 30 Cal. 4th at 1055, 69 P.3d at 976, 135 Cal. Rptr. 2d at 59 (Kennard, J., concurring and dissenting, joined by Werdegar and Moreno, JJ.).

To be sure, the divergence of opinion in the appellate court's decision as well as in the above-cited cases from foreign jurisdictions reveals a "[r]ough equality in the persuasiveness of the competing arguments." C. Thatcher, *Recovery of "Lost Punitive Damages" as "Compensatory Damages" in Legal Malpractice Actions: Transference of Liability or Transformation of Character?*, 49 S.D. L. Rev. 1, 3-4 (2003). However, after careful consideration, I would adopt the reasoning of the courts that have allowed recovery of lost punitive damages in the underlying case as compensatory damages in the legal malpractice action. As a learned commentator recently explained:

> "Even if the competing arguments are considered to be about equally persuasive, it does not seem appropriate *** to adopt an exception to the general rule entitling plaintiff-clients in legal malpractice actions to recover the full value of their lost claim, including any punitive damages they would have collected but for the defendant-lawyer's negligence. *** [T]he punitive damages portion of the award the client should have collected from the original tortfeasor is legitimately transformed into a portion of the compensatory damages the client must be able to recover from the negligent lawyer in order to make the client whole and vindicate the client's expectation interest." (Emphasis omitted.) 49 S.D. L. Rev. at 30.

I agree with the appellate court that section 2–1115 of the Code of Civil Procedure does not bar recovery of lost punitive damages in a legal malpractice action.

Although I would have upheld the award of lost punitive damages as a component of Tri-G's compensatory damages in the legal malpractice action, I note that a remittitur would have been required. The jury assessed Tri-G's compensatory and punitive damages in the underlying case in the amount of $1,168,775 for each component, a ratio of one-to-one. Earlier in this opinion, this court entered a remittitur of $420,213 in compensatory damages, reducing the compensatory damages award to $748,562. Consequently, to maintain the jury's one-

to-one ratio of compensatory and punitive damages, I would have entered a remittitur of $420,213 in punitive damages, thereby reducing the punitive damages award to $748,562. Therefore, in my view, the total amount remitted should be $840,426, thereby reducing the total amount of Tri-G's award to $1,497,124. See 155 Ill. 2d R. 366(a)(5).

Lastly, I agree with the court's conclusions regarding the following issues. The trial court's decision to allow Tri-G to recover damages for the 23 vacant lots and the 14 partially completed lots not specified in the 1981 complaint and the appellate court's review of that decision did not deprive Burke of procedural due process. Slip op. at 15-19. The evidence supported the award of lost profits on the 14 partially completed lots. Slip op. at 19-21. The jury's award of $1,168,775 was excessive and required a remittitur, thereby reducing Tri-G's compensatory damages award to $748,562. Slip op. at 21-25. Also, the lower courts correctly rejected Tri-G's claim for judgment interest. Slip op. at 25-28. Indeed, I embrace the court's analysis of these issues as though it were my own.

For the foregoing reasons, I concur in part and dissent in part.

JUSTICES McMORROW and FITZGERALD join in this partial concurrence and partial dissent.