NOTICE
Decision filed 08/29/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210358-U

NO. 5-21-0358

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| RICKY WILLIAMS and JULIE WILLIAMS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellees, | ) | Saline County. |
| | ) | |
| v. | ) | No. 05-L-30 |
| | ) | |
| ESTATE OF JACK L. QUARANT, | ) | Honorable |
| | ) | Todd D. Lambert, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's judgment is affirmed where the plaintiffs' attorney failed to file a civil lawsuit on behalf of the plaintiffs within the proscribed statute of limitations, and the failure to file such a lawsuit caused the plaintiffs to suffer injury in the form of actual damages.

¶ 2    The defendant, Estate of Jack L. Quarant (the Estate), appeals the trial court's judgment in favor of the plaintiffs, Julie and Ricky Williams, arising from a legal malpractice lawsuit against attorney Jack Quarant. On appeal, the Estate contends that the trial court erred in granting summary judgment on the issue of Quarant's negligence and for entering judgment in favor of the plaintiffs. For the following reasons, we affirm the trial court's judgment.

1

¶ 3                           I. BACKGROUND

¶ 4     In June 2000, Julie became pregnant with the plaintiffs' first child, a baby boy they named Payne. During Julie's pregnancy, she visited her obstetrician monthly. Julie's pregnancy appeared normal, and her obstetrician never told the plaintiffs that anything was wrong with the pregnancy.

¶ 5     On November 30, 2000, Julie was at home, sitting in a recliner, watching television, when she felt a "pull" in her lower abdomen. She got onto the floor and laid on her back, attempting to relax. The pain worsened and spread to her lower back. Julie told her sister-in-law, Angie, what was happening. Julie got into the bathtub, but the pain continued to worsen. She told Ricky and Angie that she needed to go to the hospital because of the pain she was experiencing.

¶ 6     Ricky drove Julie to Hardin County Hospital. At the hospital, Julie told the emergency room (ER) nurse that she needed to check the baby's "fetal heart tones." The ER nurse took Julie's vitals and checked the baby's fetal heart tones. Julie believed the baby's fetal heart tones were 178 but kept getting worse. Julie explained to the nurses that she started hurting in her lower abdomen, and the pain radiated to her lower back. The nurses called Dr. Sunga, who was not an obstetrician, and informed him of Julie's condition. Dr. Sunga ordered blood tests and a urinalysis. When Julie used the restroom, she noticed blood after wiping. At this point, the pain she was experiencing continued to worsen and was radiating to her vaginal area. Julie told the hospital staff what had happened and requested that she be sent to another hospital. Julie then began to experience "unreal" pain in her lower back and started bleeding vaginally.

¶ 7    Dr. Sunga subsequently ordered that Julie be transferred by ambulance to Memorial Hospital in Carbondale, Illinois, because her obstetrician was there. Julie estimated she had been at Hardin County Hospital for 1 to 1½ hours. The last fetal heart tone Julie saw before leaving Hardin County Hospital was 148. While at Hardin County Hospital, Dr. Sunga did not perform any sort of exam on Julie, and no one performed an ultrasound or checked to see if Julie was dilated.

¶ 8    The ambulance that transported Julie was part of the Hardin County Ambulance Service that was owned, operated, and maintained by Hardin County. Inside the ambulance, Julie urged the ambulance crew to hurry because she felt that she was having contractions. One of the ER nurses from Hardin County Hospital rode with Julie in the ambulance. Ricky, Angie, Ricky's niece, and one of Ricky's friends followed in a vehicle. During the transport to Memorial Hospital, Julie began to feel as if she was going to deliver her baby. She did not think that she could make it to Memorial Hospital. The ER nurse was "screaming" at the ambulance crew to turn around.

¶ 9    The ambulance slowed down and attempted to turn around in the median but got stuck because it was muddy. The ambulance was approximately one quarter of a mile from a "turnaround" when it got stuck. Ricky and the other occupants of his vehicle got out and assisted with trying to push the ambulance out of the median. The ambulance's tires were "barely touching the ground" and "throwing dirt" on everyone. While the ambulance was stuck in the median, Julie's water broke. After approximately 10 minutes, another ambulance arrived and took Julie to a hospital in Harrisburg, Illinois, which was closer than Memorial Hospital.

¶ 10    At the hospital in Harrisburg, a nurse listened for the baby's heart tones but told Julie her baby had died. The nurse left the room, and a doctor came in to check Julie. The doctor indicated that he could only feel one leg because the other leg was stuck on Julie's pelvic bone. Another doctor was contacted to deliver the baby. When Julie delivered her baby, he was stillborn, and the umbilical cord was wrapped around his neck. Thereafter, Julie was transferred to Memorial Hospital for postpartum care.

¶ 11    The plaintiffs consulted with attorney Quarant about filing a lawsuit. Quarant agreed to take their case. On March 1, 2002, Quarant filed a complaint against the Hardin County Ambulance Service on behalf of the plaintiffs. Hardin County Ambulance Service moved to dismiss the complaint based upon the expiration of the statute of limitations.[1] The circuit court granted the motion to dismiss. Quarant filed a motion to reconsider, and the circuit court denied the motion. Quarant then filed a notice of appeal with the circuit court, but did not pursue the appeal further.

¶ 12    On May 20, 2005, the plaintiffs filed a complaint for legal malpractice against Quarant. The complaint alleged that Quarant was negligent for not filing the plaintiffs' lawsuit against the Hardin County Ambulance Service and/or Hardin County within the proscribed statute of limitations, and that because of Quarant's negligence, the plaintiffs were deprived of their right to recover damages resulting from the events that transpired on November 30, 2000.

---

[1]The parties agreed that the applicable statute of limitations against Hardin County and the Hardin County Ambulance Service was one year. See 745 ILCS 10/8-101(a) (West 2000).

4

¶ 13    On January 19, 2006, the trial court granted summary judgment in favor of the plaintiffs on the issue of Quarant's negligence. The trial court found that Quarant did not file the underlying lawsuit against Hardin County or the Hardin County Ambulance Service within the applicable statute of limitations. The trial court further found that Quarant deviated from the accepted standard of legal practice by not filing the lawsuit within the one-year statute of limitations.

¶ 14    On April 7, 2010, Quarant filed a "Motion for Leave to Add Affirmative Defense" asserting that the Hardin County Ambulance Service was immune from civil liability in the absence of willful and wanton misconduct because the ambulance service had acted within the scope of the Emergency Medical Services Systems Act (EMS Act) (210 ILCS 50/1 *et seq.* (West 2000)). Quarant contended that, therefore, the plaintiffs could not have pursued a cause of action against Hardin County Ambulance Service. On May 5, 2012, Quarant passed away and the Estate was substituted as a defendant.

¶ 15    On June 26, 2017, the trial court held a bench trial on the "case within the case"[2] in the plaintiffs' legal malpractice action. At the outset of the trial, the parties stipulated to the admission of the affidavit of Dr. Fred Duboe. Dr. Duboe averred that Hardin County Hospital deviated from the accepted standard of medical care by not having Julie examined by an obstetrician or a fetal medicine expert and by not performing tests such as an ultrasound, contraction monitoring, and/or a sterile speculum examination. Dr. Duboe

---

[2]Generally, in legal malpractice cases involving litigation, the plaintiff must prove a "case within a case" because no legal malpractice exists unless the attorney's negligence resulted in the loss of an underlying lawsuit. *Uskup v. Johnson*, 2020 IL App (1st) 200330, ¶ 29.

opined that if Hardin County Hospital was unable to do these things, the hospital should have arranged for a prompt transfer of Julie to a better equipped hospital. Dr. Duboe believed the delay in transferring Julie was unreasonable and constituted a deviation from the accepted standard of medical care. Dr. Duboe opined that the deviations from the accepted standards of medical care reduced the baby's chance of survival and resulted in the baby's stillbirth. Dr. Duboe also averred that the additional delay caused by the ambulance getting stuck further reduced the baby's chances of survival and contributed to the baby being stillborn.

¶ 16    Both Julie and Ricky, who had since divorced, testified to the events that transpired on November 30, 2000. Julie testified that the loss of her baby ruined her life. She indicated that she did nothing for six months following the incident and thinks about it every day. In the time since losing her baby, Julie has seen a psychologist, a psychiatrist, and a counselor. At the time of the bench trial, Julie was still seeing a counselor once a week. Julie testified that she was a nurse at Hardin County Hospital and that, to her knowledge, the hospital did not deliver babies. Mothers were transferred to hospitals in Marion or Carbondale for deliveries. Julie confirmed that the ambulance crew did not act with animosity toward her or say anything such as, "we don't care about this lady." When asked how the loss of his baby affected him, Ricky testified that "it was bad, bad." He further testified that they left the decision of who to file suit against to Quarant's discretion. After the testimony of Julie and Ricky, the plaintiffs rested.

¶ 17    The Estate called Sabrina Banks, the director of Pope County Ambulance Service, as its only witness. Banks had been employed as a paramedic since 1997 and as an

6

emergency medical technician (EMT) for 25 years. Banks testified that in November 2015, Hardin County contracted with the Pope County Ambulance Service to run the Hardin County Ambulance Service. She further testified that the EMS Act was enacted in 1994, and that all EMS services, including ambulance services, EMT's, and hospital providers were required to follow the EMS Act. Banks indicated that in the year 2000, Hardin County Ambulance Service was subject to the EMS Act.

¶ 18    After the close of the evidence, the parties submitted written arguments. The plaintiffs argued that the evidence at trial established they would have been successful in the underlying lawsuit and recovered damages but for Quarant's negligence. The Estate argued that the Hardin County Ambulance Service was immune from civil liability pursuant to the EMS Act, absent willful and wanton misconduct. The Estate further argued that the plaintiffs had not alleged that the Hardin County Ambulance Service acted with willful and wanton misconduct. In a supplement to their rebuttal argument, the plaintiffs requested that the trial court enter judgment in their favor, or in the alternative, grant them leave to amend their complaint to conform with the evidence presented at trial.

¶ 19    The trial court granted the plaintiffs leave to amend their complaint. The record does not indicate that the defendant objected to this amendment. In their amended complaint, the plaintiffs alleged that they suffered, and will continue to suffer, the loss of society, comfort, guidance, and affection of their child because of the negligent and willful and wanton actions of Hardin County Hospital, and its agents, as well as the willful and wanton conduct of the Hardin County Ambulance Service in attempting to turn around in the median. The plaintiffs also alleged that they retained Quarant to represent them in a legal

7

action against Hardin County Ambulance Service and "any other person or entities that were negligent as a result of the events on November 30, 2000."

¶ 20   After the Estate answered the amended complaint, the trial court entered judgment in favor of the plaintiffs. The trial court found Quarant was negligent by failing to file a lawsuit on behalf of the plaintiffs against Hardin County. The trial court further found that Quarant's negligence was the proximate cause of the plaintiff's injuries because the plaintiffs were not able to recover damages for the loss of their child. The trial court determined that but for Quarant's negligence, the plaintiffs could have recovered $250,000 from Hardin County. The trial court awarded the plaintiffs a judgment in that amount.

¶ 21   The Estate filed a motion to reconsider. The Estate reasserted its argument that Quarant could not be held liable for failing to timely file a lawsuit against Hardin County and the Hardin County Ambulance Service because such entities were immune from a lawsuit pursuant to the EMS Act. The trial court denied the motion to reconsider. This appeal follows.

¶ 22                                    II. ANALYSIS

¶ 23   To state a cause of action for legal malpractice, a plaintiff must plead and prove the following: (1) the defendant attorney owed the plaintiff a duty of due care arising from the attorney-client relationship, (2) the defendant breached that duty, and (3) as a proximate result, the plaintiff suffered injury in the form of actual damages. *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 199 (2006). By its nature, a legal malpractice action depends upon a predicate lawsuit. *Nelson v. Quarles & Brady, LLP*, 2013 IL App (1st) 123122, ¶ 28. It is not sufficient to sustain the plaintiff's cause of action

8

because the attorney may have breached his or her duty. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 226 (2006). Even if the plaintiff establishes the attorney's negligence, no action will lie against the attorney unless that negligence proximately caused damage to the plaintiff. *Tri-G, Inc.*, 222 Ill. 2d at 226. The existence of actual damages is necessary to make a viable cause of action for legal malpractice. *Tri-G, Inc.*, 222 Ill. 2d at 226. Accordingly, the plaintiff must litigate a "case within a case," which requires the plaintiff to prove that but for the attorney's negligence, he or she would have been successful in an underlying lawsuit against a third party. *Tri-G, Inc.*, 222 Ill. 2d at 226.

¶ 24    Here, there is no dispute that an attorney-client relationship existed between the plaintiffs and Quarant and that Quarant did not file a lawsuit against Hardin County or the Hardin County Ambulance Service within the one-year statute of limitations. The dispute in this case centers on whether the plaintiffs would have been successful in their civil action against Hardin County and/or the Hardin County Ambulance Service.

¶ 25    The Estate contends that the trial court erred in granting the plaintiffs summary judgment on the issue of Quarant's negligence and for entering judgment in favor of the plaintiffs. In both instances, the defendant asserts the same argument. The defendant argues that Quarant could not be held liable for failing to bring a lawsuit on behalf of the plaintiffs against Hardin County and/or the Hardin County Ambulance Service because, absent proof of willful and wanton misconduct, such entities were immune from civil liability under the EMS Act.

¶ 26    The EMS Act provides as follows:

9

"(a) Any person, agency or governmental body certified, licensed or authorized pursuant to this Act or rules thereunder, who in good faith provides emergency or non-emergency medical services during a Department approved training course, in the normal course of conducting their duties, or in an emergency, shall not be civilly liable as a result of their acts or omissions in providing such services unless such acts or omissions, including the bypassing of nearby hospitals or medical facilities in accordance with the protocols developed pursuant to this Act, constitute willful and wanton misconduct.

(b) No person, including any private or governmental organization or institution that administers, sponsors, authorizes, supports, finances, educates or supervises the functions of emergency medical services personnel certified, licensed or authorized pursuant to this Act, including persons participating in a Department approved training program, shall be liable for any civil damages for any act or omission in connection with administration, sponsorship, authorization, support, finance, education or supervision of such emergency medical services personnel, where the act or omission occurs in connection with activities within the scope of this Act, unless the act or omission was the result of willful and wanton misconduct." 210 ILCS 50/3.150(a), (b) (West 2000).

¶ 27 Our supreme court has defined willful and wanton misconduct as follows:

"A wilful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care. [Citations.]" (Internal quotation marks omitted.) *American National Bank & Trust Co. v. City of Chicago*, 192 Ill. 2d 274, 285 (2000).

¶ 28 At the bench trial, the trial court heard evidence regarding the events that transpired on November 30, 2000. The evidence showed that even though the ambulance transporting Julie was approximately one quarter of a mile from a turnaround, the ambulance carelessly attempted to turn around in the median where the ambulance became stuck. The trial court also received an affidavit from Dr. Duboe. That affidavit averred that Hardin County

10

Hospital had deviated from the accepted standard of medical care in its treatment of Julie and that the delay in transferring Julie to a better equipped hospital, as well as the delay caused by the ambulance getting stuck, decreased the chance of survival for the plaintiffs' baby and resulted in the baby's death. In answering the amended complaint, the Estate admitted that the median was muddy at the point where the ambulance attempted to make its U-turn. The Estate further admitted that Julie's medical condition and the well-being of her unborn baby became "increasingly severe and emergent" because of the delay in being able to obtain medical treatment. Thus, considering the circumstances as a whole, the trial court did not err in entering judgment in favor of the plaintiffs as there was sufficient evidence of willful and wanton misconduct by Hardin County and the Hardin County Ambulance Service.

¶ 29    For the foregoing reasons, we affirm the judgment of the trial court.


¶ 30    Affirmed.