2025 IL App (1st) 242172

SECOND DIVISION
October 28, 2025

No. 1-24-2172

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| PEGGY LEMASTER and KATHLEEN MARTINEZ, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiffs-Appellants, | ) Cook County |
| | ) |
| v. | ) No. 2021 L 3407 |
| | ) |
| HYNDS, YOHNKA, BZDILL & MCINERNEY, LLC, and | ) |
| JOHN W. HYNDS, | ) Honorable |
| | ) Daniel Kubasiak, |
| Defendants-Appellees. | ) Judge, Presiding |

JUSTICE D.B. WALKER delivered the judgment of the court, with opinion.
Presiding Justice Van Tine and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiffs Peggy LeMaster and Kathleen Martinez appeal the circuit court's order granting summary judgment in favor of defendants Hynds, Yohnka, Bzdill & McInerney, LLC, and John W. Hynds on plaintiffs' legal malpractice claim. On appeal, plaintiffs contend that the court erred in granting summary judgment where material questions of fact exist regarding whether defendants breached the governing standard of care. Plaintiffs also contend the court erred in finding that plaintiffs were not third-party intended beneficiaries of the attorney-client relationship between defendants and plaintiffs' deceased brother. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Plaintiffs' brother, Mark Coffman, died on April 26, 2018. Plaintiffs had filed a prior action contesting his will, which our supreme court considered in *In re Estate of Coffman*, 2023 IL 128867. We cite that decision, where appropriate, as we set forth the relevant facts in this case.

¶ 4      Glenn Coffman, the father of plaintiffs and Mark, founded Coffman Truck Sales, Inc. in 1946. Mark worked at the business for 48 years, serving as president for 26 years. *Id.* ¶ 6. At the time of his death, Mark owned 66.7% of the outstanding shares of the business and 33.3% of the membership interests in Coffman Real Estate, LLC, which owned the real estate on which the business operated. *Id.* ¶ 7.

¶ 5      In 2001, Mark executed a will, as well as powers of attorney appointing his wife, Dorothy, as his agent for health care and property. *Id.* ¶ 8. The 2001 will named Dorothy as trustee of two trusts. The will authorized Dorothy to distribute to herself all income and principal from the trusts, excluding assets comprising Mark's interests in the Coffman businesses or proceeds from the sale of those assets. *Id.* ¶¶ 16-17. The 2001 will provided that, upon Dorothy's death, the excluded assets would be distributed to plaintiffs or *per stirpes* to plaintiffs' descendants. *Id.* ¶ 17.

¶ 6      In 2016, Mark was diagnosed with laryngeal cancer. After surgery and treatment, he found it very difficult to speak. *Id.* ¶ 9. By March 2018, Mark's cancer had metastasized, and he required heavy doses of pain medication. He relied on Dorothy to communicate for him and required her assistance with health care and daily activities. *Id.* ¶ 10.

¶ 7      On March 15, 2018, Mark's physician recommended hospice care as Mark was expected to live only six to eight more weeks. The following day, Dorothy contacted attorney John Hynds regarding Mark's estate planning. Hynds had previously handled Glenn's probate matters, and a retired partner at his law firm had drafted Mark's 2001 will. *Id.* ¶ 11. On March 17, 2018, Hynds

and his legal assistant, Lisa Barkley, met with Mark at the hospital. After the meeting, Mark signed the new will (2018 will). *Id.* ¶ 12.

¶ 8    The 2018 will differed from the 2001 will in that, under the new will, Dorothy was granted part of Mark's business ownership interests outright, with the rest granted to her as trustee. The 2018 will also authorized Dorothy to name the recipients of the ownership interests in trust at her death. Thus, "[i]n contrast to the 2001 will, the 2018 will authorized Dorothy, not [plaintiffs], to designate the ultimate disposition of the excluded assets." *Id.* ¶ 18.

¶ 9    After Mark's death, the 2018 will was admitted to probate. Plaintiffs contested the will, alleging that it was the result of Dorothy's undue influence over Mark. Plaintiffs argued that the 2018 will was executed when Mark was physically weak and taking regular doses of pain medication. *Id.* ¶ 20. They alleged that, due to his compromised condition, Mark reposed trust and confidence in Dorothy and depended on her for financial matters. *Id.* ¶ 21.

¶ 10    After a bench trial, the probate court denied plaintiffs' petition and entered a directed finding and judgment for Dorothy. *Id.* ¶ 38. The court found that plaintiffs failed to present any evidence of actual undue influence. *Id.* The court also found that plaintiffs did not present sufficient evidence to satisfy the elements of presumptive undue influence. *Id.* ¶ 39. The appellate court affirmed, and the supreme court granted plaintiffs leave to appeal. *Id.* ¶ 44.

¶ 11    On August 10, 2022, while the will contest case was pending before the supreme court, plaintiffs filed their three-count amended complaint alleging legal malpractice against Hynds and his law firm in drafting Mark's 2018 will. The complaint alleged that plaintiffs were third-party intended beneficiaries of the attorney-client relationship between Mark and defendants. In count I, plaintiffs alleged that defendants breached their duty to plaintiffs as Mark's intended beneficiaries where the 2018 will resulted from Dorothy's exertion of undue influence over Mark.

¶ 12    Count II alleged that "[a] reasonably prudent attorney would have declined to provide the legal services Dorothy requested of defendants on March 16, 2018, [which was] to prepare a new will for Mark to execute." Plaintiffs alleged that the circumstances of defendants' retention should have caused concern because Dorothy was "urgently requesting preparation of a will for bed-side execution the next day by a gravely ill testator who had never himself discussed his estate planning with the drafting lawyers, and had been suffering from delirium." Dorothy "stood in a fiduciary relationship with" Mark and "purported to speak for him concerning his wishes, *** including material changes to her benefit, and then actively engaged in the only discussion between lawyer and testator." Plaintiffs asserted that Illinois courts have "long recognized that a mind wearied and debilitated by long-continued and serious illness is susceptible to undue influence." As Dorothy was also a fiduciary, plaintiffs alleged that there existed "a material risk of undue influence" and that attorneys retained under these circumstances must "proceed with the utmost caution."

¶ 13    Count II also alleged that defendants "failed to take reasonable and appropriate measures within the standard of care of reasonable estate planning attorneys." Specifically, defendants failed to (1) "interview Mark privately concerning his testamentary intentions"; (2) interview his treating physicians; (3) "engage an independent psychologist or psychiatrist to assess Mark's vulnerability to undue influence"; (4) encourage Mark to read the documents himself and "allow him time and privacy to do so"; (5) "ask Mark about his reasons for making radical changes to his plan, and Dorothy's role in the process," and whether she exerted pressure on him; (6) "advise Mark of the high risk" that his changes would "elicit a will contest"; (7) obtain Mark's informed consent regarding the "multiple conflicts of interests faced by" defendants in representing both him and Dorothy; (8) "evaluate or consider Mark's vulnerability to undue influence as a result of his medical conditions"; (9) "address the risk of undue influence *** when a chief beneficiary is an

- 4 -

active agent in procuring a will of a weakened and debilitated testator or when a fiduciary procures the will"; and (10) identify and analyze Mark's estate.

¶ 14    Plaintiffs' expert David Rolewick opined that defendants failed to conduct themselves as would a reasonably prudent attorney, "given the conflicts of interest and multiple red flags warning of possible undue influence and possible testamentary incapacity." Plaintiffs claimed that, "[b]ut for defendants' failure to take the measures alleged *** and other negligent conduct, Mark would not have executed the 2018 will."

¶ 15    Defendants filed a motion for summary judgment. Therein, defendants argued that *res judicata* and collateral estoppel applied to bar plaintiffs' claim where the appellate court had found no undue influence in the procurement of the 2018 will. Defendants also alleged that they owed no duty to plaintiffs and that plaintiffs could not establish proximate cause showing that but for the undue influence, and defendants' failure to protect Mark from such undue influence, Mark would not have executed the 2018 will. The circuit court stayed further proceedings on plaintiffs' malpractice complaint pending the supreme court's decision in *In re Estate of Coffman*.

¶ 16    The supreme court filed its opinion on November 30, 2023. Before the supreme court, plaintiffs had argued that "the 2018 will should be declared invalid because Dorothy exerted undue influence over Mark to procure it." *Id.* ¶ 46. The supreme court noted that plaintiffs did not dispute the circuit court's finding that there was no evidence of actual undue influence. *Id.* ¶ 38. Therefore, the issue was whether the evidence supported a presumption of undue influence. The court first determined that "the 2001 power of attorney for property created a fiduciary relationship between Mark and Dorothy as a matter of law." *Id.* ¶ 69.

¶ 17    However, the presumption also required proof that the 2018 will was procured by Dorothy for her benefit. In considering this element, the supreme court looked at whether there was

evidence that Dorothy exerted undue influence in procuring the preparation of the 2018 will. *Id.* ¶ 77. We set forth the court's findings and determination in detail, as they are relevant to our disposition in this case.

¶ 18    The supreme court noted that "Hynds and Barkley testified unequivocally that Mark was competent to execute the new will and that Mark chose the will that represented his wishes." *Id.* ¶ 77. The supreme court reviewed the evidence at trial:

> "Hynds testified that he believed Mark had directed Dorothy to arrange the meeting in the hospital room. Dr. Showel testified that Mark's delirium resolved around that time and that he discussed treatment plans with Mark, who was alert and oriented to time and place. Given that Mark was hospitalized, had difficulty speaking, and had limited use of the hand he used to write, one could reasonably expect Dorothy to facilitate the meeting with Hynds.
>
>     Hynds presented Mark with three estate planning options and guided him through each one. Hynds testified that authorizing Dorothy to direct the distribution of all the assets through her own estate plan was important to Mark. Hynds and Barkley opined that Dorothy did not overpower Mark into making the new will, and [plaintiffs] presented no evidence that Dorothy made false or misleading representations to Mark. The testimony is consistent that Mark, not Dorothy, directed the discussion and decisions concerning the new will. Mark was fully engaged and understood the process. Dorothy inserted herself into the discussion, but Mark overruled her initial preference for an outright distribution. And Mark specifically asked Hynds to cross out a provision that might have benefitted [plaintiffs] because Mark was concerned it would hinder Dorothy's control over the excluded assets.

As the [circuit] court observed, Mark's deteriorating condition afforded Dorothy the opportunity to enlist the help of an unfamiliar, unwitting counsel to prepare a will that represented Dorothy's wishes, not Mark's. Instead, Dorothy contacted Hynds, who was familiar to Mark and his family. She also did not attempt to conceal the meeting, as she informed [plaintiffs] in advance that Mark was revisiting his estate plan.

The circuit court found that, under the circumstances, Dorothy's arrangement of the meeting, her presence in the room during the meeting, and her payment of the law firm's invoice do not qualify as improper procurement of the contested will. The court, mindful of the marital relationship, found that Dorothy's involvement amounted to the type of caring assistance an ill testator would hope to expect from his devoted spouse of 24 years. The circuit court's judgment is not arbitrary, unreasonable, or not based on the evidence."

*Id.* ¶¶ 78-81.

¶ 19    After the supreme court filed its decision, plaintiffs requested that the circuit court in the malpractice case take judicial notice of the opinion. Plaintiffs also conceded that summary judgment should be entered on count I of their complaint because the supreme court found no presumption of undue influence by Dorothy in the preparation and execution of Mark's 2018 will. The circuit court granted summary judgment on count I and set a hearing as to count II.

¶ 20    Following oral argument by the parties, the circuit court issued its order. Although it denied summary judgment based on *res judicata* and collateral estoppel, it noted that on the issue of undue influence, the supreme court had affirmed the finding that Dorothy did not exert undue influence on Mark. The circuit court reasoned that, "[w]hile Plaintiffs argue that Count II does not rely upon Dorothy's 'undue influence,' it is difficult, if not impossible, to remove the argument of 'undue influence' from Plaintiff's Complaint."

¶ 21 The circuit court found that "[r]emoving Dorothy and the matter of 'undue influence' from consideration, the only possible conclusion that can be reached from the record is that Mark directed Hynds as to the 2018 Will, and Mark made the decisions regarding Plaintiffs." The court further determined that plaintiffs were not third-party intended beneficiaries of the attorney-client relationship between Mark and defendants. Rather, the primary purpose of Mark's engagement of defendants was "to provide for Dorothy." The circuit court therefore granted summary judgment in favor of defendants on both counts of plaintiffs' complaint.

¶ 22 Plaintiffs filed this appeal.

¶ 23                                    II. ANALYSIS

¶ 24 Summary judgment is proper where the pleadings, depositions, and affidavits on file show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Kleinschmidt, Inc. v. County of Cook*, 287 Ill. App. 3d 312, 315-16 (1997). The purpose of summary judgment is not to try an issue of fact but to determine if one exists. *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 280 (2007). In reviewing a grant of summary judgment, we construe the record strictly against the movant and liberally in favor of the nonmoving party. *Id.* The trial court's determination on a motion for summary judgment is reviewed *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).

¶ 25 Because we find this issue dispositive, we address whether the doctrine of collateral estoppel bars plaintiffs' malpractice claim. We recognize that the circuit court's order stated that collateral estoppel did not apply. However, the court also found that the supreme court had affirmed the finding in a prior case that Dorothy did not exert undue influence on Mark regarding the 2018 will and that it was "difficult, if not impossible, to remove the argument of 'undue influence' from Plaintiff's Complaint." The court granted defendants' motion, in part, because it

found that, if the issue of undue influence was removed from plaintiffs' malpractice claim, "the only possible conclusion that can be reached from the record is that Mark directed Hynds as to the 2018 Will, and Mark made the decisions regarding Plaintiffs." Plaintiffs acknowledged "[t]he trial court's tacit application of collateral estoppel" in their brief.

¶ 26   For collateral estoppel to apply, three threshold requirements must be met: (1) the issue decided in the prior adjudication was identical to the issue raised in the present case, (2) there was a final judgment on the merits, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication. *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 390 (2001). "[T]he party sought to be bound must actually have litigated the issue in the first suit and a decision on the issue must have been necessary to the judgment in the first litigation." *American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378, 387 (2000). Even where the threshold elements of collateral estoppel are satisfied, a court must balance the need to limit litigation against the right of a party to fully present his case. *Id.* at 391.

¶ 27   Plaintiffs contend that collateral estoppel does not apply where their prior case focused on the consequences of Dorothy's conduct, while their malpractice claim concerns the negligent conduct of defendants. They argue that the probate court's "narrow finding" in the prior case, that the 2018 will did not result from Dorothy's undue influence, is not identical to their claim that defendants' negligence caused Mark to execute the 2018 will.

¶ 28   Although the two cases alleged different misconduct by different parties, the pertinent inquiry for collateral estoppel purposes is whether "some controlling fact or question material to the determination of both causes has been adjudicated against that party in the former suit by a court of competent jurisdiction." *Nowak*, 197 Ill. 2d at 389-90. In other words, we must consider whether the "prior order thoroughly discussed and decided an identical issue that is relevant" to

the disposition of the subsequent case. *Abramson v. Marderosian*, 2018 IL App (1st) 180081, ¶ 46. If such a determination was made, collateral estoppel precludes the subsequent claim. *Id.* ¶ 43.

¶ 29 To prevail on their legal malpractice claim, plaintiffs must plead and prove that (1) defendants owed them a duty of due care arising from the attorney-client relationship, (2) defendants breached that duty, and (3) as a proximate result, plaintiffs suffered injury. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 225 (2006). Importantly, proof that defendants breached their duty of care is not sufficient, in itself, to sustain a cause of action for legal malpractice. *Id.* at 226. Plaintiffs must also establish that defendants' negligence proximately caused damage to them. *Id.* "The existence of actual damages is therefore essential to a viable cause of action for legal malpractice." *Id.*

¶ 30 In their malpractice complaint, plaintiffs claimed that defendants' conduct breached their duty of care and, as a result, they negligently drafted the 2018 will, which Mark executed. On the element of damages, plaintiffs alleged that they suffered injury where changes made to the 2018 will stripped them of the remainder interest in two family businesses, as well as a remainder interest in 50% of the remaining trust assets, which the 2001 will had granted to them.

¶ 31 Generally, when there is a claim that an attorney negligently drafted a will, the compensable injury stems from the fact that the will did not effectuate the testator's intent. See *Simon v. Wilson*, 291 Ill. App. 3d 495, 510 (1997) (finding that the complaint sufficiently alleged injuries resulting from the negligent drafting of a will where it alleged that the testator intended to benefit the plaintiffs but that intent was not realized); *Ogle v. Fuiten*, 102 Ill. 2d 356, 359 (1984) (finding that the complaint sufficiently alleged negligence in tort where it alleged that the testators intended to leave their property to the plaintiffs, the defendants had a duty to draft wills that would effectuate this intent, the defendants breached their duty, and the plaintiffs suffered damages as a

result). Thus, the mere fact that Mark bequeathed less to plaintiffs in his 2018 will is not dispositive of the damages issue. There is no dispute that Mark, as the testator, was free to change his mind at any time regarding his bequests. Accordingly, in order to establish that they suffered damages resulting from the negligent drafting and execution of the 2018 will, plaintiffs must show that the will did not reflect Mark's true intent regarding his bequests.

¶ 32    In their malpractice complaint, plaintiffs disputed that the 2018 will actually reflected Mark's intent where defendants failed to take certain precautions given the circumstances of their engagement. Plaintiffs referred to Mark's increasingly compromised condition due to cancer and asserted that defendants should have been concerned with Dorothy "urgently requesting preparation of a will for bed-side execution the next day by a gravely ill testator who had never himself discussed his estate planning with the drafting lawyers, and had been suffering from delirium." Plaintiffs alleged, among other things, that defendants failed to "interview Mark privately concerning his testamentary intentions," failed to "ask him about his reasons for making changes to his plan and Dorothy's role in the process," and failed to "address the risk of undue influence" where Dorothy, as a chief beneficiary and fiduciary, was "an active agent in procuring a will of a weakened and debilitated testator."

¶ 33    It is well established that undue influence "of such a nature as to destroy the testator's freedom concerning the disposition of his estate and render his will that of another" is sufficient to invalidate a will. *In re Estate of Hoover*, 155 Ill. 2d 402, 411 (1993). However, the court in plaintiffs' probate case explicitly found that they failed to present any evidence of actual undue influence, and plaintiffs did not appeal this finding. See *In re Estate of Coffman*, 2023 IL 128867, ¶ 38.

¶ 34　In determining whether plaintiffs proved a presumption of undue influence, the probate court found that Mark was not dependent on Dorothy and that he directed Dorothy to contact defendants. It found that Mark, not Dorothy, directed the discussion and decisions concerning the new will and that he was fully engaged and understood the process. Although Dorothy inserted herself into the discussion, Mark overruled her initial preference for an outright distribution. Mark specifically asked Hynds to cross out a provision that might have benefited plaintiffs because Mark was concerned it would hinder Dorothy's control over the excluded assets. Based on this evidence, the supreme court affirmed the probate court's finding that there was no presumption of undue influence where Dorothy's conduct did not "qualify as improper procurement of the contested will." *Id.* ¶ 81.

¶ 35　Plaintiffs' legal malpractice complaint alleged that defendants failed to take precautions to protect Mark from undue influences that, left unchecked, overpowered his ability to act freely in executing the 2018 will. However, this exact issue of undue influence was fully considered and decided by the probate court in the will contest case, which found no actual or presumptive undue influence regarding the 2018 will. Plaintiffs also had an opportunity to argue this issue before our supreme court, which affirmed the probate court's judgment. Accordingly, we find that collateral estoppel applies to bar plaintiffs from asserting that Mark's execution of the 2018 will resulted from the exertion of undue influence. See *Nowak*, 197 Ill. 2d at 390 (explaining that the judgment in the first suit operates as an estoppel on the issue actually litigated and determined).

¶ 36　As the circuit court below found, "[r]emoving Dorothy and the matter of 'undue influence' from consideration, the only possible conclusion that can be reached from the record is that Mark directed Hynds as to the 2018 Will, and Mark made the decisions regarding [the distribution of property to] Plaintiffs." In other words, the provisions of Mark's 2018 will were requested by him

and represented his actual intent. Therefore, even if defendants had failed to take certain precautions regarding the 2018 will, plaintiffs cannot prove damages resulting from the execution of that will. Since plaintiffs failed to establish an element of their malpractice claim, summary judgment for defendants was appropriate. *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 215 (2006).

¶ 37    Due to our disposition of this issue, we need not address whether plaintiffs were third-party intended beneficiaries of the attorney-client relationship between defendants and Mark.

¶ 38                                    III. CONCLUSION

¶ 39    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 40    Affirmed.

---

*LeMaster v. Hynds, Yohnka, Bzdill & McInerney, LLC*, 2025 IL App (1st) 242172

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2021-L-3407; the Hon. Daniel Kubasiak, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | David E. Lieberman, of Levenfeld Pearlstein, LLC, and Matthew J. O'Hara and Lillian Grappe Lamphere, of Smith Gambrell & Russell, LLP, both of Chicago, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | John J. Duffy and Nathaniel S. Widell, of Swanson, Martin & Bell, LLP, of Chicago, for appellees. |

---